STEVENS ET AL. *v.* CITY OF SALISBURY

(Four Appeals in One Record)

[No. 442, September Term, 1964.]

558

*Decided December 3, 1965.*

*Concurring opinion filed December 8, 1965.*

The cause was argued before Prescott, C. J., and Horney, Marbury, Oppenheimer and Barnes, JJ.

*Raymond S. Smethurst, Jr.,* and *John B. Robins,* with whom were *Charles J. Potts, Adkins & Potts* and *Robins & Robins* on the brief, for the appellants.

*Victor H. Laws, City Solicitor of Salisbury,* for the appellee and cross-appellant.

Prescott, C. J., delivered the majority opinion of the Court. Barnes, J., concurs in the result. Concurring opinion at page 573, *infra*.

Interesting and important principles of law are involved in this appeal, some of which are fundamental and novel in nature. The case has been ably briefed and argued by counsel on both sides.

Appellants, the owners of three corner properties (the Stevenses, the Hostetters, and Miss Hopkins), located within the boundaries of the City of Salisbury, challenge the validity of § 42 of the Zoning Regulations of that city, which reads as follows:

"The City of Salisbury, Maryland, Ordinance No. 789

### August 3, 1959

Sec. 42. Obstruction of view at intersections.

As an aid to freer safe movement of vehicles at and near street intersections and in order to promote more adequate protection of the safety of children, pedestrians, operators of vehicles and for property, for proposed construction hereafter:

1. There shall be limitations on the height of fences, walls, gateways, ornamental structures, hedges, shrubbery and other fixtures, construction and plantings in all districts where front yards are required on corner lots.

2. Such barriers to clear unobstructed vision at corners of intersecting streets shall be limited to a height of not over three feet above the established elevation of the nearest curb, for a distance of twenty-five feet along both the front and side lot lines, measured from the point of intersection, of the said intersecting lot lines.

3. Within the isosceles triangle formed as required in item 2, by connecting the ends of the respective twenty-five foot distances, all the fixtures, construction, hedges, shrubbery and other plantings shall be limited to a height not over three feet

above the elevation of the curb level at the said intersecting streets.

4. Within the said triangle, and in cases where front yards are terraced, the ground elevation of such front yards shall not exceed three feet above the established curb elevation at the said intersecting streets.

5. Within two years from passage of this ordinance all barriers, except buildings and tree trunks cleared of limbs hanging below a distance of eight feet above the established curb elevation, to clear unobstructed vision within the area specified above, shall be removed."

The Stevenses own a corner lot (fronting about 93 feet on one of the intersecting streets and some 175 feet on the other) which has a natural elevation one foot in excess of the 3 foot elevation permitted by § 42 and it is supported by a masonry retaining wall covered in part by ivy. The lot is otherwise improved by several large shrubs and trees. Miss Hopkins is the owner of a corner lot having frontage on Lehigh Avenue of about 159 feet and on Philadelphia Avenue of about 137 feet. Within the triangle mentioned in the ordinance there are ornamental posts constructed of brick and stone, and hedges, shrubbery and trees or other plantings in excess of the height of 3 feet above the established elevations of the nearest curbs. The Hostetters are the owners of a lot at an intersection with frontages of about 60 feet and 102 feet on the intersecting highways. Within the triangle mentioned in the ordinance there are shrubbery and fences in excess of a height of 3 feet above the established curb elevation.

The photographic exhibits clearly disclose the hazardous nature of the respective intersections involved, and it is not denied that the barriers mentioned in all three of the cases obstruct vision within the triangular areas mentioned. The appellee, in its bills of complaint, conceded "that some or all of the aforesaid plantings and structures on the defendants' property existed prior to August 3, 1959 * * * and * * * did not violate any law or ordinance at the time same were constructed

or planted." No attempt was made in the proof to show that any of the barriers had been erected or planted after the effective date of the ordinance; hence we shall assume that all of such barriers were in place prior to such effective date.

All of the defendants below demurred to the respective bills of complaint. The court below, relying upon our decision in *Grant v. City of Baltimore*, 212 Md. 301, overruled the demurrers, and after a hearing, the court ordered the Stevenses to remove, at their own expense, the masonry corner posts and terrace or slope of land, together with all ivy, shrubbery, grass and other plants "within said triangular area" to a height not exceeding 3 feet above the established elevation of the nearest curb. Miss Hopkins was ordered to reduce two masonry corner posts and all shrubbery and plantings (except tree trunks clear of limbs hanging below a distance of 8 feet above the established curb elevation) within "said triangular area" to a height not exceeding 3 feet above the curb elevation, or in lieu of reducing such structures, etc., in height, by removing same from the triangular area. The Hostetters were ordered to reduce all pickets of their driveway gate to the same level as the adjoining fence pickets (being approximately 3 feet, 4 inches in height) and to remove from the triangular area all existing shrubbery and plantings exceeding a height of 3 feet above the established curb elevation (except for tree trunks clear of limbs hanging below a distance of 8 feet above the curb elevation), or in lieu of removing such shrubbery and plantings by reducing same to a height not exceeding 3 feet above the curb elevation. And the defendants, their heirs, successors and assigns were permanently enjoined "to refrain thereafter from violating the said provisions of Section 42 * * *."

The property owners appealed from the decree, and the City appealed from that portion thereof which permitted the Hostetters to retain their fence pickets at a height of 3 feet, four inches.

We stated at the outset that elementary and fundamental principles were involved in this appeal. They relate to the respective rights of individual owners and of government reasonably to regulate the use of property or to take the same under its power of eminent domain. After the close of the Revo-

lutionary War, the ownership of property in this country has frequently been referred to as "allodial" in nature or that the property is held by "allodial tenure." In its strict sense, "allodium" means land owned absolutely, and not subject to any rent, service, or other tenurial right of an overlord; however, it has been, and is, uniformly recognized throughout this country that the ownership of property is subject to the rights of government to tax the property, to regulate reasonably its use and enjoyment under the police power of the States, and to take the same, upon payment of the value thereof, when needed for a public purpose.

All the parties recognize the above; however, the appellants insist that § 42 is an attempt to "take" their property for public use without just compensation which is proscribed by Article 23 of The Declaration of Rights, Article III, § 40 of the Maryland Constitution and Amendment V of the United States Constitution, while the appellee earnestly contends that the Section is a mere "regulation of the use of property," for which no compensation need be paid.

As § 42 is obviously a zoning ordinance and is specifically so designated, it is apparent that its validity (as that of all zoning regulations) depends upon whether or not its promulgation was a proper exercise of the State's "police power." [1] Many text-writers and able jurists have expressed themselves upon the meaning and extent of the police power of the States. Judge Cooley has collected many of such expressions and sets them forth in Chapter XVI of his thorough and splendid work.

---

1. Appellee cites several sections in its Charter wherein it has been delegated the police power to make certain specific regulations. It would gain little to set them forth in detail and consider them separately. The regulation of the use of property by the exercise of the police power began long before "zoning," as we now know it, came into being; and, although zoning regulations, as such, and regulations passed under a general delegation of police power may sometimes overlap, it is generally recognized that zoning is purely statutory in nature and cannot be effectuated under a general grant of police power. Perry v. Board of Appeals, 211 Md. 294. Cf. Hewitt v. Baltimore County, 220 Md. 48, 63. We shall therefore proceed to consider the Section's validity under the zoning statutes.

564

*2 Cooley, Constitutional Limitations,* Ch. XVI (8th ed.). No one seems to have attempted to formulate a comprehensive definition of the term "police power," and if it were possible to do so and were done, it would destroy the flexible nature of such power, which is essential to carry out and accomplish its purposes. There can be little doubt that the ever-growing complexities of our society will call, 25 years from now, for regulations under the State's police power not now thought of.

For present purposes, the following observations with reference to the police power will suffice. Such power is broad in scope; it is an inherent attribute and prerogative of sovereignty, and has been described as essentially "no more than the power to govern." *Allied Amer. Co. v. Comm'r,* 219 Md. 607. It has long been recognized in this State, as established by a long line of decisions of this Court, that the Legislature has an inherent right to prescribe, within constitutional limitations, reasonable regulations, which are necessary to protect the public health, comfort, order, safety, convenience, morals and general welfare. And this right may be delegated to the municipalities of the State. *LaRoque v. County Commissioners of Prince George's County,* 233 Md. 329. In the instant case, the regulation involved only attempts to regulate the use and enjoyment of private property. No attack is made upon the validity of the Zoning Enabling Act, Code (1957), Article 66B, but, as stated above, the challenge is to the validity of § 42 itself.

Many years ago, it was held by this Court that the constitutional proscriptions against the taking of private property for public use without just compensation were not intended to restrain the reasonable exercise of the police power. *American Coal Co. v. Allegany Co.,* 128 Md. 564. See also *C. B. & Q. Ry. v. Drainage Comm'rs,* 200 U. S. 561. On the other hand, it has been held that the State cannot, under the guise of the police power, take private property for public use without compensating the owner. *Capital Transit Co. v. Bosley,* 191 Md. 502. Our present controversy lies in one of the above categories. Innumerable cases and books upon the subject have been found, examined and considered. The decisions and the authors seem to be in accord in stating the principles of law involved, but a

careful examination of the authorities discloses that when a "regulation" approaches the line of demarcation between it and a "taking" (and we think this is such a case), it sometimes does so by almost imperceptible gradations, so that it is difficult to determine where "regulation" ends and a "taking" is effectuated.

When confronted with a similar situation, the Supreme Court of Washington, in *Ackerman v. Port of Seattle,* 348 P. 2d 664, 668, expressed itself ably and well as follows:

> "One of the fundamental principles involved in this action is the ownership of private property and the right to the free use and enjoyment thereof. Another basic principle is the authority of the government (always subject to constitutional safeguards) to regulate the use and utilization of private property for the promotion of the public welfare. At times, as in the instant litigation, these principles are in conflict, and the courts are called upon to resolve the resulting problem in human and legal relationships. In doing so, the courts constantly emphasize the concepts of (1) 'regulation' under the police power, and (2) 'constitutional taking or damaging' under the eminent domain power. When restrictions upon the ownership of private property fall into the category of 'proper exercise of the police power,' they, validly, may be imposed without payment of compensation. The difficulty arises in deciding whether a restriction is an exercise of the police power or an exercise of the eminent domain power. When private property rights are actually destroyed through the governmental action, then police power rules are *usually* applicable. * * * But, when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable."

See also 11 *McQuillin, Municipal Corporations* (3 rev. ed.) § 32.27; *Baltimore v. Himmelfarb,* 172 Md. 628.

What is a "taking of property" for which compensation must be paid and what is a reasonable curtailment of the use and en-

joyment of property for which no payment need be made depend upon the facts of each particular case. *Baltimore v. Marine Works,* 152 Md. 367. Of course, every "taking" involves an injury to the property owner, but every injury does not involve a "taking" in a constitutional sense. *M. & C.C. of Balto. v. Bregenzer,* 125 Md. 78.

The appellants insist that § 42 takes from them a "sight easement" over their property for the benefit of the public, and they cite the well-known airspace-easement cases relative to the flight of airplanes, such as *United States v. Causby,* 328 U. S. 256, *Highland Park v. United States,* 161 F. Supp. 597 (Ct. Cl.), *Delta Air Corporation v. Kersey,* 20 S. E. 2d 245 (Ga.). They also cite *United States v. 29.40 Acres of Land,* 131 F. Supp. 84 (D. C., N. J.) where the court held that the government's limiting the landowners' use, including the types of electronic impulses that could emanate from the property, constituted a compensable servitude, and *Chappell v. United States,* 34 F. 673 (D. C., Md.) where an analogous ruling was made. See also *Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U. S. 327 (right to fire projectiles over landowner's property for artillery practice a "taking"). And compare *McQuillin, op. cit.,* § 32.26, p. 329; *Garrett v. Lake Roland R. R. Co.,* 79 Md. 277.

The appellee counters by arguing that the ordinance calls for no physical invasion of the properties involved; hence there can be no taking thereunder in a legal sense. In the view that we take of the case, it will be unnecessary to decide this question, for we shall assume, without deciding, that there can be, under proper circumstances, a taking in a constitutional sense, even though there be no direct encroachment upon private property.

This brings us to a consideration of the terms and provisions of § 42. It is well-established law that a statute or ordinance will be construed so as to avoid a conflict with the constitution whenever that course is reasonably possible. *Kirkwood v. Provident Savings Bank,* 205 Md. 48; *Brooklyn Apts. v. M. & C. C. of Balto.,* 189 Md. 201; *Hellmann v. Collier,* 217 Md. 93. If construed as a prospective enactment, compare *Higgins v. City of Baltimore,* 206 Md. 89, we think that certain portions of § 42 are immune from constitutional attack.

It is an accurate statement to say that every restriction upon the use and enjoyment of property is a "taking" to the extent of such restriction; but every "taking" is not a "taking" in a constitutional sense for which compensation need be paid. *Allied American Co. v. Comm'r, supra,* 219 Md. 607. See also the brief of Mr. Metzenbaum in the landmark zoning case of *Euclid v. Ambler Co.,* 272 U. S. 365, 368. This Court stated in *Lipsitz v. Parr,* 164 Md. 222, 234: "The court has lately had for consideration the relation of the constitutional protection of property to the police power, with the result that it is now established that reasonable regulation, which is not confiscatory, but which leaves the owner in substantial enjoyment of his property, although diminishing its value through the restriction of its use, is valid without compensation." The distinctions between a taking for which compensation must be made and a taking by regulation under the police power are largely distinctions in degree. *Baltimore v. Himmelfarb,* 172 Md. 628; *Belt R. Co. v. Sattler,* 100 Md. 306; *Allied American Co. v. Comm'r, supra.* See also 1 Rathkopf, *The Law of Zoning & Planning,* § 6-5; *Freund, Police Power,* § 518; *Bent v. Emery,* 53 N. E. 910 (Mass.), opinion by Justice Holmes. But in order to be compensable, the damage resulting from the restriction must be "substantial," *United States v. Cress,* 243 U. S. 316, 328, *United States v. Causby, supra,* 328 U. S. 256, 266, and constitute "severe interferences which are tantamount to deprivations of use or enjoyment of property." *Baltimore v. Himmelfarb, supra.*

Applying the above principles of law to the facts of the instant case, we hold that subsections 1, 2 and 3 of § 42 (as prospective measures) are lawful and valid regulations under the police power, and no compensation need be paid for the restrictions imposed therein. The constantly increasing number of motor vehicles on our highways and the mounting and appalling number of deaths and injuries from traffic accidents show the public purpose to be served by the subsections, without more being said relative thereto. The "unobstructed vision" requirement is over segments of the properties already restricted to "front yard" uses, and the height restriction of three feet is reasonable. Considering all of the attendant circumstances

and especially the comparatively small portions of the properties to which the restrictions apply, it scarcely can be seriously argued, we think, that they are "confiscatory" in nature, that the owners are not left "in substantial enjoyment of their properties," or that the damages resulting from the restrictions are "substantial" in character, constituting "severe interferences which are tantamount to deprivations of use or enjoyment of property." All corner-lot owners are treated alike, and the rather small contribution in behalf of public safety and convenience required of each such owner is offset by the benefits accruing to the general public and those received from other corner-lot owners, when the first mentioned owner (or his family) becomes a member of the traveling public.[2]

Had we been required to consider only subsections 1, 2 and 3, we would not have set forth the law at the length we did above. Subsections 4 and 5 give us more difficulty. Subsection 4 is, we think, unreasonable, confiscatory in nature, and if enforced, would amount to a taking of private property for public use without compensation. This subsection is also not entirely free from ambiguity. It has two aspects. First, it provides, *"within the said triangle* (emphasis ours) * * * the ground elevation of such front yards shall not exceed three feet above the * * * curb elevation * * *." This (together with subsection 5) is a mandate to property owners at intersections to

---

2. Cf. City of Bellaire v. Lamkin, 317 S. W. 2d 43 (Tex. Sup. Ct. 1958) (fence in front yard); Rhyne, Municipal Law, 844-845, 850-851; 7 McQuillin, op. cit., 527-528, 534-535; Cochran v. Preston, 108 Md. 220 (not a zoning case); Appeal of Parker, 214 N. C. 51 (height of wall in yard); Rhyne, op. cit., 582 (removal of weeds); 6 McQuillin, op. cit., 624-625 (removal of weeds); Greenwood v. City of Lincoln, 55 N. W. 2d 343 (Neb.) (removal of weeds and vegetation); 25 Am. Jur., Highways, § 64 (removal of weeds, brush and hedges); Chaput v. Demars, 243 P. 311 (Kan.) (trimming of hedges); Northern Pac. Ry. Co. v. Adams Co. 138 P. 307 (Wash.) (cutting of weeds); Commonwealth v. Watson, 3 S. W. 2d 1077 (Ky.) (removal of bushes, weeds, etc. and trimming of hedge fences). But see City of Norris v. Bradford, 321 S. W. 2d 543 (Tenn.); Wondrak v. Kelley, 195 N. E. 65 (Ohio); Williams v. City of Hudson, 262 N. W. 607 (Wisc.); and State v. Zumpano, 146 N. E. 2d 871 (Ohio), wherein fence regulations were held invalid for reasons not here pertinent.

grade (and remove the excess soil), at their own expense, their properties so that the ground elevation within the triangles shall not exceed three feet regardless of how much grading is required, and even if the excess in ground elevation resulted from natural causes or from lawful and permissible man-made changes. It also provides, "* * * and in cases where front yards are terraced, the ground elevation of *such front yards* (emphasis again ours) shall not exceed three feet above the * * * curb elevation * * *." This seems to say in no uncertain terms that if any front yard at an intersection be terraced, the ground elevation "of such front yards" (i.e. the elevation of the entire front yard) shall not exceed three feet above the curb elevation at the intersection. It is difficult to discover any sound reason why one lot owner whose front yard is not terraced may have any elevation for his front yard he desires (except in the small triangular space), but his neighbor down the street, who happens to have a terraced yard, cannot exceed an elevation of three feet at any place in his whole yard. However, this precise question is not involved in the three cases presently before us; so we pursue it no further.

As we view the situation, it is a very different thing for government to say to a property owner that you must refrain from exercising certain ordinarily permissible rights upon a relatively insignificant segment of your property to subserve a real public need (subsections 1, 2, and 3) than to require that owner to destroy, reduce, and/or remove, at his individual expense, his own property, possibly to avert the necessity of erecting, at public expense, a stop sign or other traffic signal (subsections 4 and 5). When government does the former, it is acting in the realm of regulation; when it does the latter it is traveling in the territory of a "taking." The former is a clear illustration of what the Supreme Court of Washington meant when it said in the quotation, *supra,* "when private property rights are actually destroyed through the government action, then police power rules are *usually* applicable," while the latter illustrates the statement therein, "but, when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable." As was stated by former Chief Judge Brune: "Zoning cannot be used

as a substitute for eminent domain proceedings so as to defeat the constitutional requirement for the payment of just compensation * * *." *Congressional School v. State Roads Comm.*, 218 Md. 236. See also *Scholl v. Borough of Yeadon*, 26 A. 2d 135 (Pa.). Or to use the oft-quoted statement of Mister Justice Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U. S. 393, 416: "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

In enacting Section 42, the City has attempted to render the maintaining of the barriers in the small triangles non-conforming uses, and then under the theory of "amortization" of non-conforming uses require the property owners to bear the expense of either removing the barriers or reducing them to a height of not over three feet. Much has been said and written concerning "sudden death," "compulsory liquidation," and "amortization" provisions relative to non-conforming uses. Practically all of the law and all of the decisions relating to amortization may be found in *Grant v. City of Baltimore, supra. Harbison v. City of Buffalo*, 152 N. E. 2d 42 (N.Y.), and 2 Rathkopf, *op. cit.*, Ch. 62, but it would serve no useful purpose for us to deal elaborately with such law and decisions here, for we do not believe the present situation presents a true case of amortization.

Zoning in this country will mark its fiftieth anniversary next year according to a note in 35 Va. L. Rev. 348 (however in deciding the *Euclid* case in 1926, the Supreme Court said zoning had been in existence in this country for about 25 years). It received a tremendous impetus in 1926, when the Supreme Court decided the celebrated case of *Euclid v. Ambler, supra,* and, thereafter, hundreds of cities and other municipalities have enacted and promulgated zoning regulations. Yet, at this late date, appellee states in its brief, "no case has been found construing a zoning statute identical or closely similar to Section 42 * * *." (The *Lamkin* case, *supra,* involved a similar ordinance, but the case dealt only with a front yard fence constructed *after* the enactment of the regulation and in spite of warning to the property owners.) True amortization provisions

almost if not universally call for a termination of non-conforming uses after the lapse of a reasonable, specified period in order that the owner may amortize his investment (the reasonableness of the period depends upon the nature of the non-conforming use, the structures thereon, and the investment therein), and such amortization provisions, made for the property owners' benefit, cannot, we think, be disguised and utilized to exact a public benefit from the owners' property, under the circumstances here involved, at the owners' expense. There are, of course, a number of cases wherein property owners have been required to remove (usually under the nuisance theory) from their land structures or walls which had fallen into such a dilapidated state as to constitute menaces and dangers to the general public using streets, sidewalks, or thoroughfares, but we have been referred to no case, and have found none, where a Court of last resort has required the removal (under a zoning ordinance), at the property owners' expense for the public safety or convenience, ordinarily innocuous improvements on his dwelling-house property or his shrubbery, which were lawful and permissible at the time they were placed thereon prior to the enactment of the removal ordinance. This statement is subject to exceptions previously noted; namely, true amortization ordinances relative to non-conforming uses and the removal of weeds, brush and vegetation, and the trimming of hedges. At this point, we note particularly the provision of subsection 5 stating that all barriers should be removed "except * * * tree trunks cleared of limbs hanging below a distance of eight feet above the * * * curb elevation." Possibly this provision would be reasonable if limited to specific types of trees (for example high ones where in the usual course of events trimming or cutting back the lower branches and leaves would not destroy their value or usefulness), but the provision applies to all tree trunks. It is not difficult to foresee the incongruous results if the provision were applied to many species of trees.

In the case at bar, the principal objects ordered to be removed or reduced are a portion of a front yard still in its natural state, together with a masonry retaining wall and masonry corner post and  shrubbery and ivy, on the Stevens land; two

masonry corner posts and shrubbery from the Hopkins property; and pickets of a wooden driveway gate and shrubbery from the Hostetter property. Miss Hopkins and the Hostetters were also ordered to remove all trees within the triangular areas, except tree trunks clear of limbs hanging below 8 feet above the established curb elevations. The record, including the exhibits, fails to show with certainty what types of trees were here involved or what labor and expense the property owners would entail if forced to comply with the decree. The exhibits do show, however, several pieces of the shrubbery concerned. No attempt was made to show whether the shrubbery could be "trimmed" or "cut-back" to the required height without destroying its value.

As indicated above, we think the provisions of subsections 4 and 5 are unreasonable in requiring the property owners to destroy (or reduce) their property at their own expense and are therefore invalid, and we so hold. In order that this ruling may not be misunderstood, we add that under the authorities cited in footnote 2, property owners possibly may be required under the provisions of subsections 1, 2 and 3 to keep their "hedges, shrubbery and other plantings," even though planted before their enactment, trimmed to meet the height restriction, provided such trimming will not destroy the usefulness of the object trimmed or result in substantial loss to the property owner.

The learned Chancellors below relied upon our holding in the *Grant* case, *supra,* for their ruling. That case is readily distinguishable from the one at bar. It involved a discontinuance of a commercial use in a residential zone, and the ordinance called for a real amortization of a non-conforming use. The non-conforming use was caused by the property ordered to be removed: a billboard. The heart of the holding in *Grant* may be shown by two short excerpts therefrom. They follow: "There would seem to be a clear basis for classifying billboards separate and apart from other signs and other advertising [it was noted in the dissent in *Harbison, supra,* that billboards seem to occupy a category in and to themselves]," and "The distinction between an ordinance that restricts future uses and one that requires existing uses to stop after a reasonable time, is not a

difference in kind but one of degree and, in each case, constitutionality depends on overall reasonableness, on the importance of the public gain in relation to the private loss." We reaffirm our holdings in *Grant,* and, without laboring the question unduly, repeat what we said above. We do not believe that subsections 4 and 5, which require the owners of dwelling properties to destroy or reduce customary and ordinarily harmless improvements to such properties, at their own expense for the public benefit, can be sustained as reasonable and constitutional provisions.

Our rulings above make it unnecessary to consider appellee's cross-appeal.

The appellants' demurrers should have been sustained (Maryland Rule 345 d), but leave should have been given to the appellee to amend, so that the City, if it desired, could have alleged that some of the plantings or construction had been done after the effective date of the ordinance, and/or that some of the plantings lawfully could be required to be trimmed or cut back.

> *Decree reversed, and case remanded for further proceedings consistent with this opinion, appellee to pay the costs.*

BARNES, J., filed the following concurring opinion.

I concurred in the result in this case and heartily endorse the holdings and indeed substantially all of the reasoning of the majority necessary for the holdings in the case. In my opinion, however, some aspects of the applicable law should have received additional emphasis and I am not able to agree with certain statements in the majority opinion which seem to me to perpetuate a prior error and, in any event, are unnecessary to the decision of the case.

Although subsections 1, 2 and 3 of §42, as prospective measures are, in my opinion, not unconstitutional or invalid *on their face* either as a taking of private property for public use without just compensation or as a denial of due process of law as being arbitrary, unreasonable or discriminatory, I think it

should be clearly pointed out that this does not mean that in a *particular case* the *application* of subsections 1, 2 and 3 may not be unconstitutional and invalid as to the particular property as a violation of the State and federal constitutions prohibiting the taking of private property for public use without just compensation, depriving a person of his property without due process of law or possibly denying a person the equal protection of the laws. Although I think all of this is implicit in the majority opinion and, in part explicit in that opinion, it seems wise to me to emphasize these applicable principles at this time so that the administrative officials who have the responsibility of enforcing subsections 1, 2 and 3 will avoid the constitutional pitfalls likely to be present in such enforcement. The *usual* way to control vehicular traffic at street intersections is by means of the erection of stop signs or, if they will not be effective, by the erection of traffic lights. There may well be factual situations in which the *only reasonable way* to meet the particular situation is by use of one of these usual methods and not by the attempted enforcement of subsections 1, 2 and 3, as such enforcement possibly would not effectuate the purpose of those subsections or be otherwise unreasonable. We should clearly indicate *now* that in this sensitive area of private property rights involving in many (if not most) instances a person's use and enjoyment of the land on which his home has been erected, this Court will examine with a critical eye, any enforcement of these subsections alleged to be unreasonable, arbitrary, capricious or discriminatory.

The majority has most properly pointed out that the case at bar is readily distinguishable from the decision of this Court in *Grant v. Mayor and City Council of Baltimore,* 212 Md. 301, 129 A. 2d 363 (1957), on which the chancellors below relied in sustaining subsections 4 and 5 of the Ordinance. As I am quite convinced, however, that *Grant* was erroneously decided and that we should, as soon as the occasion arises, overrule it, I cannot agree with the statement in the majority opinion that "we reaffirm our holdings in *Grant* * * *." I cannot accept the legal theory upon which the decision in *Grant* was based, i.e., that there is only a difference in degree between a zoning ordinance that restricts future uses and one that requires existing uses to stop

after a reasonable time and that this reasonable time is to be determined by a "reasonable" period of "amortization" set out in the ordinance providing for the elimination of existing non-conforming uses. In my opinion, the difference is a fundamental difference *in kind* and the "amortization" principle cannot be applied to confiscate vested property rights without the payment of just compensation.

It may well be, of course, that the application of the "amortization" doctrine relied on in the *Grant* case will be limited to billboards only, as they "seem to occupy a category in and to themselves" as the majority points out was indicated in the dissent [1] in *Harbison v. City of Buffalo*, 4 N. Y. 2d 553, 571, 152 N. E. 2d 42, 52 (1958), and will not be applied to the

---

1. Although the opinon of Judge Van Voorhis of the New York Court of Appeals in the Harbison case is called a "dissenting" opinion, the fact is that there is no majority opinion in the Harbison case. The "opinion" of the Court by Judge Froessel was only concurred in by Judge Burke. Judges Desmond and Fuld only concurred in the result "upon the principles stated in People v. Miller, 304 N. Y. 105, 108, 109, 106 N. E. 2d 34, 35, 36 (1952)." These principles were that where there is an inconseqential nonconforming use which does not amount to a vested right (raising pigeons as a hobby was involved in Miller) and the deprivation of that use will not substantially affect the owner's property rights in the use of his premises, the zoning ordinance prohibiting such a nonconforming use will be upheld. Chief Judge Conway and Judge Dye concurred with the opinion of Judge Van Voorhis, so that 3 of the 7 judges of the New York Court of Appeals agreed with the principles annunciated by Judge Van Voorhis, while only 2 of the 7 judges agreed with the principles set forth by Judge Froessel. It should also be pointed out that the result in the Harbison case was to reverse the Appellate Division, without costs, and to remand the case to the Special Term to take testimony relating to the nature of the surrounding neighborhood, the value and condition of the improvement on the premises, the nearest area to which the property owners might relocate their junk and cooperage yard, as well as any other reasonable costs which would bear on the kind and amount of damages which the owners might sustain and whether the owners might be able to continue operation of their business if not allowed to continue storage of barrels or steel drums outside their frame building. In other words, the remand was to determine if the ordinance was in fact unreasonable, arbitrary and capricious as applied to the owners in the particular case.

usual private property rights in nonconforming uses. If not ultimately overruled competely, the decision in *Grant* should be so limited.

The difficulty is that the language of the opinion in *Grant* is so broad and the theory upon which it rests so appealing to those who apparently desire to eliminate nonconforming use "by a shorter cut than the constitutional way of paying for the change"—to use the words of Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon*,[2] 260 U. S. 393, 416, 43 S. Ct. 158, 160, 67 L. Ed. 322, 326 (1922), quoted in the majority opinion—that new applications of that language and of that theory are sought by legislative bodies which affect substantial and important private property rights. The case at bar is an excellent example of this very thing [3] and I think it wise to file a *caveat* at this time to the correctness of the decision in *Grant* and its possible future application by this Court.

As the majority points out, substantially all of the decisions in regard to "amortization" appear in *Grant, Harbison* and 2 RATHKOPF, THE LAW OF ZONING AND PLANNING ch. 62 (1960) and it would not be appropriate to consider them in detail in this concurring opinion. The "dissenting" opinion (see Note 1) of Judge Van Voorhis in *Harbison,* however, so completely expresses my views on the impropriety of applying the "amortization" theory to destroy ultimately what I consider to be vested private property rights in nonconform-

---

2. Mr. Justice Holmes also made an observation in the Mahon case which is quite relevant: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. * * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States." (Page 415 of 260 U. S.; page 160 of 43 S. Ct.; page 326 of 67 L. Ed.).

3. Even the learned chancellors below fell into error in trying to follow what they understood was the decision in the Grant case. It is small wonder that the members of legislative bodies and the holders of administrative offices may also fall into error.

ing uses, that I think it would be helpful to quote from that opinion. Judge Van Voorhis said:

> "This citation of authority is enough to display the confusion into which this subject is becoming involved in some jurisdictions in consequence of departing from the established rule. The courts find themselves obliged, without any guiding principle, to pick and choose between instances where a prior non-conforming use will or will not be protected in the courts. It is generally implied in discussions of the subject that the sponsors of the zoning movement were merely temporizing with the courts by leading them in the beginning to hold that a prior use constituted a vested right. The facts in the cases cited, where there has been a departure from that rule, illustrate how impossible it would be to confine a ruling like the one in this case to a junk yard, or to determine judicially what would be a reasonable period of time for removal in a specific case within the meaning of the Constitution. * * *
>
> "In practice this spells confusion, instability, inability to diagnose what are legal rights, inconsistency, arbitrariness and discrimination in administrative and court decisions, and an avalanche of litigation. That Pandora's box is opened, regardless of the best possible intentions on the part of all concerned. Nor is the judgment appealed from an unwarranted interference by the courts in the province of the municipal legislature. It simply follows precedent from the beginning of zoning practice. The new rule has the additional infirmity that it opens wide new fields of discretion in administrative law without any workable standards by which it is to be guided.
>
> "The lack of any principle in applying the novel theory of 'amortization' betrays a fundamental weakness in the theory. Zoning, like other public programs, is not always best administered at the hands of its enthusiasts. The existence of non-conforming uses has spoiled the symmetry in the minds of zoning experts. It has bulked so large in this context that, desirable

as the elimination of nonconforming uses may be, it has sometimes been presented as though it were more important than ordinary property rights. * * * The fault found with eminent domain is that it failed to achieve the object of destroying the owner's right in his property without paying for it. Consequently the most promising legal theory at the moment is known as 'amortization'. This theory is discussed in some of the cases and in most of the law review articles which have been cited as upholding constitutionality of these measures. 'Amortization' is explained as follows: ' "The only positive method of getting rid of non-conforming uses yet devised is to amortize a non-conforming building. That is, to determine the normal useful remaining life of the building and prohibit the owner from maintaining it after the expiration of that time." ' The opinion in City of Los Angeles v. Gage, 127 Cal. App. 2d at page 455, 274 P. 2d at page 41 adds: 'The length of time given the owner to eliminate his nonconforming use or building varies with the city and with the type of structure.'

"This theory to justify extinguishing nonconforming uses means less the more one thinks about it. It offers little more promise of ultimate success than the other theories which have been tried and abandoned. In the first place, the periods of time vary so widely in the cases which have been cited from different States where it has been tried, and have so little relation to the useful lives of the structures, that this theory cannot be used to reconcile these discordant decisions. Moreover the term 'amortization', as thus employed, has not the same meaning which it carries in law or accounting. It is not even used by analogy. It is just a catch phrase, and the reasoning is reduced to argument by metaphor. Not only has no effort been made in the reported cases where this theory has been applied to determine what is the useful life of the structure, but almost all were decided under ordinances or statutes which prescribe the same time limit for

many different kinds of improvements. This demonstrates that it is not attempted to measure the life of the particular building or type of building, and that the word 'amortization' is used as an empty shibboleth. This comment applies to the ordinance at issue on this appeal. There could be no presumption that all junk yards, all auto wrecking or dismantling establishments, and all improvements assessed for tax purposes at not more than $500 will or have any tendency to depreciate to zero in three years. This shows that the ordinance in suit could not possibly have been based on the amortization theory.

"Moreover this theory, if it were seriously advanced, would imply that the owner should not keep up his property by making necessary replacements to restore against the ravages of time. Such replacements would be money thrown away. The amortization theory would thus encourage owners of nonconforming uses to allow them to decay and become slums." (Pages 52-54 of 152 N. E. 2d; pages 572-575 of 4 N. Y. 2d).

If there are any adequate answers to these observations, the adjudicated cases applying the "amortization" theory have not, in my opinion, yet expressed them. I have concluded that there are no such adequate answers.