STATE ROADS COMMISSION OF THE STATE
HIGHWAY ADMINISTRATION *v.* TOWN OF
COLMAR MANOR ET AL.

[No. 771, September Term, 1981.]

*Decided March 12, 1982.*

The cause was argued before Moylan, Wilner and Bishop, JJ.

*Henry F. Leonnig, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Nolan H. Rogers, Assistant Attorney General,* on the brief, for appellant.

*Paul S. Warshowsky,* with whom were *Robert H. Levan* and *Levan, Schimel & Richman, P.A.* on the brief, for appellees.

Bishop, J., delivered the opinion of the Court.

This is an appeal from the ruling of the Circuit Court for Prince George's County prohibiting the State Highway Administration, appellant, from abandoning a "quick take" condemnation proceeding. The court's ruling was based upon a finding that there had already been a "taking" of the appellee's property.

On January 23, 1979, appellant filed a petition for the condemnation of certain property in Prince George's County, naming as defendants the Town of Colmar Manor, a municipal corporation (appellee); Prince George's County, and the Washington Suburban Sanitary Commission. Neither of the latter two defendants is involved in this appeal since neither has any financial interest in the proceedings. A check in the amount of $185,250.00, payable to the Clerk of the Court, was simultaneously deposited with the petition, which in part recited:

> ". . . your Plaintiff deems the said sum of money to be the fair market value of the land and improvements taken and damages done to the aforesaid property. That your Plaintiff states that it is in the public interest and necessary for the State Roads to

> take possession of the aforesaid land and improvements immediately upon depositing the said money into the hands of the said Clerk of the Court, and in conformation with the aforesaid provisions of statute it is so taking possession for the aforesaid purposes, on the    day of   , 19   ."

The condemnation petition closed with prayers for condemnation of the property and further proceedings.

On February 16, 1979, the appellee filed a Motion to Withdraw Funds Paid Into Court. The motion recited the filing of the condemnation petition and the deposit of the check; set out the appellee's ownership of the property and the lack of any financial interest of the Washington Suburban Sanitary Commission and Prince George's County; and asserted appellee would not contest the taking but would contest the reasonableness of the offer. On February 26, 1979, the court granted the motion, and the money was withdrawn.

For the next 22 months the parties engaged in discovery and traded other pretrial motions. The only items of importance that occurred were appellant's response to appellee's interrogatory No. 7 and appellee's response to appellant's interrogatory No. 9. The former asked "What do you contend to be the date of taking of the property to be condemned?" to which appellant responded "January 26, 1979." Appellant's interrogatory No. 9 requested information with reference to the use and occupancy of the said property within the past 5 years to which the appellee responded:

> "9. The following named persons occupied the subject property within the past five (5) years:
>
> (a) Pincus Liquors and Pincus Grill
>      3839 Blandensburg Road
>      Colmar Manor, Maryland
>
>      See attached Lease.
>
> (b) D & D Tire Company, Inc.
>      3901 Bladensburg Road
>      Colmar Manor, Maryland
>
>      See attached Lease.

(c) Russell F. Barrett,
   T/A Trojan Trojan Inc.
   3933 Bladensburg Road
   Colmar Manor, Maryland

See attached Lease."

Attached to that answer were copies of the leases: 1) a lease between appellee and Pincus Liquors and Pincus Grill dated May 1, 1973 reciting a rental of $300.00 per month on a month to month term, terminable upon 30 days notice by either party; 2) a lease between appellee and D & D Tire Company, Inc. dated June 1, 1976 reciting a rental of $1,168.75 per month for an initial term of 8 months and thereafter renewable on a month to month basis, terminable upon 30 days notice by either party; 3) a lease between appellee and Russell F. Barrett, T/A Trojan Trojan, Inc. dated November 12, 1974 reciting a rental of $1,375.00 per month on a month to month term, terminable upon 30 days notice by either party.

On January 9, 1981, appellant filed a petition to abandon the condemnation, alleging in part that:

"... on January 7, 1981, the State Roads Commission by resolution made and adopted, (copy attached), determined that the Highway Project which was the subject of the initial condemnation proceeding is to be deleted from the official State Highway Administration program and further authorized the Office of Real Estate and Office of Counsel to take such steps as are necessary to abandon this condemnation proceeding filed prior hereto against the defendants herein."

On May 13, 1981, the court denied the petition based on a finding that there had been a taking and, therefore, appellant would not be permitted to abandon. From the denial of the petition this appeal was filed.

*Question Presented*

The sole question raised in this appeal is whether the court erred in finding that a taking had occurred under Section 12-102 (1) of the Real Property Article and therefore abandonment of the condemnation proceedings is precluded pursuant to § 12-109 (d) (1) of the same Article.

*Law*

This case involves a "quick take" condemnation by the appellant under the accelerated procedure set out in Part IV of the Transportation Article, Annotated Code of Maryland. Section 8-334 (b) of that Article provides, in relevant part, that "condemnation proceedings under this part shall follow the procedures set forth in Title 12 of the Real Property Article and the Maryland Rules."

In terms of the issue before us, two provisions of Title 12, Real Property Article are relevant: namely, § 12-109 (d) which precludes abandonment of a condemnation proceeding after a "taking" has occurred (*see also* Md. Rule U 26), and § 12-102, which defines when a "taking" occurs. Section 12-102 provides:

"In this title, property is deemed to be taken:

(1) If the plaintiff lawfully is authorized to take the property before trial pursuant to Article III of the Constitution of the State, or any amendment to it, and the required payment has been made to the defendant or into court, any required security has been given, and the plaintiff has taken possession of the property and actually and lawfully appropriated it to the public purposes of the plaintiff.

(2) In every other case, if the plaintiff pays the judgment and costs pursuant to Subtitle U of the Maryland Rules."

As the proceeding here was a "quick take" one, the precise question is whether the events required by Section 12-102 (1) have occurred in this case. The required payment of

course was deposited into court, but had the appellant *"taken possession of the property and* actually and lawfully appropriated it to the public purposes of the plaintiff" (emphasis supplied)?

The legislative history of Section 12-102 shows clearly that the General Assembly desired to make the taking of possession a separate and independent element of a "taking," not to be subsumed merely in the more amorphous concept of "appropriation" to a public use.

Section 12-102 was enacted as Chapter 52, Acts of 1963, which began as Senate Bill 8 (1963). As introduced, the bill provided that a taking would occur under a "quick take" arrangement when the security had been paid and "there has been an actual and lawful appropriation of the property to the public purposes of the plaintiff." During the legislative process, however, the last quoted phrase was deleted and replaced with the current language:

> "The plaintiff has taken possession of the property and actually and lawfully appropriated it to the public purpose of the plaintiff."

The lower court based its finding that there had been a taking and, therefore, that there could be no abandonment on the appellant's answer to appellee's interrogatory No. 7, and "the long period of time between the petition and the decision to abandon" and on *Hardesty v. State Roads Comm'n,* 276 Md. 25, 343 A.2d 884 (1975), using the following language:

> "THE COURT: In determining whether or not there has been a taking, which is obviously the heart of the issue — if there has been no taking, then clearly abandonment would not be proper —
>
> *Hardesty* would seem to indicate to this Member of the Court that filing the petition, paying into Court is probably not sufficient to constitute a taking, although certainly there [sic] are factors. If there was a physical appropriation, clearly there

would be a taking. In the absence of a physical appropriation, though, there can still be a taking, and we think there can still be a taking in other than just scenic easement cases.

In determining whether or not there has been a taking there are a number of factors. One factor as was present in *Hardesty* is the long period of time between the petition and decision to abandon. In this case, there is another major factor, and that is the fact that in answers to interrogatories plaintiff's representatives under oath in a document filed in the case of public record stated that there had been, in fact, a taking. If physical appropriation is something known only to the plaintiff when they allege in answers to interrogatories, and make an admission like that that there has been, in fact, a taking, that we feel is a major decisional circumstance.

Based on the totality of circumstances in this case we feel that there has clearly been a taking. Therefore we feel that there can be no abandonment."

Not only was there no evidence of physical possession or appropriation to its public purposes by the appellant but, on the contrary, there was an explicit concession by the appellee's attorney that "there was no physical entry on the property" and "the property is still as it was in 1979." In addition, there were three commercial leases (from which the appellee was collecting rents) in existence before and during the entire period of this litigation.

Based on the foregoing there was neither positive possession by the appellant nor negative influence on the appellee's actual possession and use. The court gave no weight to either the actual possession of the appellee or to the existence of the leases but rather referred to the appellant's interrogatory answer as to the date of taking as "a major decisional circumstance." We find that the court

misread both the statute and *Hardesty* and was clearly erroneous in its evidentiary conclusions.

We accept the appellant's argument that "clearly the intent of the answer was not to indicate that possession and appropriation had occurred but rather to indicate a date of valuation, concepts often confused in this area." *State Roads Commission v. Adams,* 238 Md. 371, 375, n 2, 209 A.2d 247 (1965).

For the proposition that the interrogatory answer "is clearly not conclusive on the State Roads Commission," *Safeway Trails, Inc. v. Smith,* 222 Md. 206, 214, 159 A.2d 823 (1960) is cited in which the Court of Appeals held:

> ". . . that if an inconsistency appears between statements in a pre-trial deposition and testimony at the trial, the weight and credibility of the testimony are for the jury."

and that the

> ". . . answers of the adverse party became substantive evidence — sworn, *although not conclusive, admissions of fact."* (Emphasis supplied.)

In the case *sub judice* the answer of the appellant that a taking had taken place on January 26, 1979 involves both law and fact and, therefore, was not conclusive as to if and when a taking had occurred.

With relation to the concession by appellee's attorney that there was no physical taking the appellant refers us to *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 300 A.2d 367 (1967), wherein Judge O'Donnell for the Court of Appeals stated:

> "The actions of an attorney within the scope of his employment are binding upon his client under the ordinary principles of agency." (Cites omitted.) "This is particularly true concerning the stipulation of counsel in open court." (Cites omitted.) *Id.* at 45, 46.

In 2 Nichols on *Eminent Domain* (3rd ed.) 6.1 (1) p. 6-16, we find:

"A mere declaration of an intention to take or even a threat to take, cannot constitute a taking under the fifth amendment."

In *Hardesty, supra* at 34, the Court of Appeals held:

"The petition filed by the Commission in the present case sought to condemn a scenic easement, together with the right of ingress or egress across the right-of-way lines along the 4.4 acres of the property fronting on the highway, and the right to erect snow fences within 100 feet of the land condemned. As previously indicated, the Commission's petition to abandon the condemnation proceeding alleged simply that no taking had occurred. The only evidence adduced at the hearing in support of the Commission's petition to abandon consisted of a stipulation that 'there had been no physical appropriation, no physical taking of the property' and that the scenic easement to be acquired was 'for the purpose of leaving the trees there.' Considering the position taken by the Commission that physical entry upon the property was required before a taking could be mandated, the skimpy evidentiary record before us, the character of the property interest at stake, the immediate entry procedure employed by the Commission in undertaking to condemn the property, the fact that the public enjoyment of the scenic beauty of the property was immediate, the length of time involved before the Commission elected to abandon condemnation, and the legal restrictions placed upon the property during the pendency of the condemnation proceedings, *we conclude that Hardesty was deprived of the full use and enjoyment of his property by the Commission's action to a degree sufficient to constitute a taking within the contem-*

*plation of § 12-102 of the Real Property Article.*[1]
*See Stevens v. City of Salisbury, supra.* The Commission cannot, therefore, totally abandon the condemnation proceedings it initiated on August 1, 1973." (Emphasis supplied.)

Before setting out the foregoing upon which the Court of Appeals based its holding, Chief Judge Murphy, for the Court, defined the scenic easement involved as a "negative easement":

> "The concept of a scenic easement according to *Kamrowski v. State,* 31 Wis.2d 256, 263, 142 N.W.2d 793, 796 (1966) 'springs from the idea that there is enjoyment and recreation for the travelling public in viewing a relatively unspoiled natural landscape . . . .' One federal statute defines a scenic easement as 'the right to control the use of land . . . for the purpose of protecting the scenic view . . . but such control shall not affect, without the owner's consent, any regular use exercised prior to the acquisition of the easement.' 16 U.S.C.A. § 1286 (c) (1970). *A scenic easement has otherwise been characterized as a negative easement or servitude precluding the owner of land from doing an act which, if no easement existed, he would be entitled to do*:
>
> > 'Negative easements involve the payment to the landowner for a termination or extinguishment of a portion of his property rights. Scenic easements are an example: the landowner is paid by the state to terminate his right to erect structures or buildings or otherwise use his land so as to destroy the view from the highway. *The state obtains no rights*

---

1. The Commission suggests that no taking occurred because it did not exercise its right to erect snow fences within 100 feet of the property. There is no evidence in the record, one way or the other, showing whether the Commission exercised this right. Assuming it did not, however, we would not thereby be persuaded that no taking of the scenic easement occurred."

> *to enter upon the land, either for its depart-*
> *ments or for the public at large. The state*
> *obtains only the right to enforce the negative*
> *easement through court action.'* (Emphasis
> supplied.)
>
> Comment, *Progress and Problems in*
> *Wisconsin's Scenic and Conservation Ease-*
> *ment Program,* 1965 Wis. L. Rev. 352, 360
> (1965)." 276 Md. at 30 (Emphasis supplied.)

Judge Murphy pointed out that the property owner-appellant had argued "that the occupancy or possession of a scenic easement is visual, not physical; that it is a negative easement prohibiting the landowner from altering the scenic nature of his land ... that ... the ... easement was along a well-travelled highway ..." that the property owners "refrained for 10 months from taking any action inconsistent with the scenic easement" and, therefore, "the property was possessed by the public and appropriated to the purposes of the Commission." This, the appellants in *Hardesty* argued, coupled with the payment into court and the withdrawal of the sum deposited, amounted to a taking. The State, the appellee in *Hardesty,* argued that before a taking occurs within the meaning of Real Property Section 12-102 there must be a physical entry and that the mere filing of the plot and the posting of money is not sufficient, however the Court of Appeals pointed out that there can be a taking without either the divesting of the owner of his title or "without actual physical appropriation, entry or seizure ...." The Court quoted selected parts from Nichols, *Eminent Domain,* Sec. 6.1 (1) (3rd ed. 1970). For the purpose of this opinion we will set out the complete paragraph from which the Court of Appeals quoted in part:

> "Constitutional rights rest on substance, not on
> form, and the liability to pay compensation for prop-
> erty taken cannot be evaded by leaving the title in
> the owner, *while depriving him of the beneficial use*
> *of the property.* It has already been shown that a
> legal restriction upon the use of land may constitute

a taking, although the title is unaffected and the land is physically untouched, and the same is true when the owner's enjoyment of the land is physically interfered with, although his legal rights remain unimpaired. However, just how severe the interference with the owner's enjoyment of his property must be to constitute a taking, and to render a statute authorizing the injury, but providing for no compensation, unconstitutional, is not a question which can be answered in such a way as to furnish a concise rule readily applicable to all cases likely to arise. Each case must be decided on its own merits until, by the gradual process of judicial exclusion and incusion, it is possible to say on which side of the line any given injury to private property rights may be said to fall. *In a general way, however, it may be said that when an interference with the use and enjoyment of land that would be actionable at common law is effected under legal authority and as an incident to the construction of a public improvement, and consists of actual entry upon land and its devotion to public use for more than a momentary period, or of an injury of such a character as substantially to oust the owner from the possession of the land and to deprive him of all beneficial use thereof, there is a taking of property in the constitutional sense, whether there has been any formal condemnation or not.* In the absence of such ouster or deprivation of all beneficial use, the inflicting of injury upon adjacent land by the proper construction and non-negligent maintenace of a legislatively authorized improvement does not constitute a taking." (Emphasis added.)

In *Hardesty,* the Court of Appeals, citing *Stevens v. City of Salisbury,* 240 Md. 556, 214 A.2d 775 (1965), observed:

"... that not every injury to property involves a taking, that compensation for a taking may be exacted only for *severe interferences which are*

*tantamount to deprivations of use or enjoyment,* and that *whether there has been a taking is dependent* on the facts of each case." *Id.* at 32. (Emphasis supplied.)

From *La Fontaine's Heirs,* 205 Md. 311, decided in 1953, before the passage of Section 12-102, the *Hardesty* Court quoted:

"The Constitutional prohibition against the taking of private property means: '* * * *taking* the property from the owner, and *actually* applying it to the use of the public. It does not mean the preliminary measures necessary in such cases.' *Steuart v. Baltimore,* 7 Md. 500, 516. (Emphasis in *Steuart.*)" 276 Md. at 32, 33.

The *La Fontaine* Court continued:

"The distinction between a possession which may be legal, yet not constitute a taking, and a possession and use which amounts to a taking is pointed up by Judge Chesnut in *United States v. Certain Parcels of Land, etc.,* 61 F. Supp. 164, 169." *Id.* 320-321.

"In *United States v. Certain Parcels of Land, etc., supra,* it is pointed out that even the title which the Federal Government takes under statute, which authorized immediate occupancy of land to be taken for public use, is defeasible, the Government being divested if there was no authority in law to take the property. *This is so even though the statute expressly says that title is vested in the Government on the taking and the right to compensation shall correspondingly vest in the landowner.*" 205 Md. at 322. (Emphasis supplied.)

The following is the holding in *Steuart,* 7 Md. 500 at 516, decided in 1855, and cited in *La Fontaine, supra:*

"Prohibition against taking private property until payment or tender of compensation is first made, and the right to have the amount of compensation settled by a jury or by agreement, are the

important rights designed to be secured to the owners of property by the present constitution. And although the proposed street has been surveyed, the survey reported, and the damages and benefits assessed, yet the appellant's land has not been taken, in the legal sense of that word. *Bonaparte v. R.R. Co.,* 1 Baldwin C.C., 226. *The constitutional prohibition against taking private property for public use, until compensation is first paid or tendered, means taking the property from the owner, and actually applying it to the use of the public.* It does not mean the preliminary measures necessary in such cases. To hold that compensation must be paid or tendered, before a survey should be made, or other preparatory steps taken, would be a construction of the Constitution not required by its language, or necessary for the protection of private rights. *It is quite a sufficient protection, if the owner is secured in the use and enjoyment of his property until the damages he may sustain are constitutionally ascertained, and paid or tendered.*" (Emphasis supplied.)

The Maryland Court of Appeals in *Steuart* cited *Bonaparte* as authority for determining when private property is taken in a condemnation proceeding. *Bonaparte* was a case arising in Maryland decided in 1830 by Judge Henry Baldwin of the Circuit Court of the U.S. for the Third Circuit. With reference to when a taking occurs that requires compensation, Judge Baldwin stated:

"The first question arising is, for what compensation must be made; or, *in other words, what is the taking of private property for public use, by a canal, rail road, turnpike, or other improvement or work, to be constructed for public convenience? An entry on private property for the sole purpose of making the necessary explorations for location, is not taking it, the right remains in the owner as fully as before; no permanent injury can be sustained,*

> *nothing is taken from him, nothing is given to the company. When nothing further is done, it is competent for the legislature to give this authority, without any obligation to compensate for a damage which must be trivial. . . ."* (Emphasis supplied.)

and

> "The duty of the legislature is to provide for compensation, and of the company to make it, *simultaneously with the disseisin of the owner, and the appropriation of his property to the purposes of the law."* (Emphasis supplied.)

Although *La Fontaine's Heirs* was decided before the passage of Real Property Article § 12-102, our research leads us to conclude that § 12-102 is the statutory enactment of what the law had been in Maryland since at least 1830.

All of the foregoing convinces us that a taking in a "quick take" condemnation procedure is at that point when the "authorized appropriation of land for public use has actually taken place," *La Fontaine's Heirs, supra,* and such appropriation has placed legal restrictions on the property for a period of time which causes "substantial interference with . . . [the] property which destroys or lessens its value (or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed)," *Nichols, supra,* and "possession" in some form has occurred.

In basing the court's decision on Hardesty, the judge in the case *sub judice* found two major points: 1) the long period of time between the filing of the petition and the attempt to abandon; 2) the answer to the interrogatory in which the appellee responded that there had been a taking.

It appears that the court interpreted the answer to the interrogatory as an admission that the appellant did, in fact, possess and appropriate the property. The appellant said it, therefore it must be so. *Cogito ergo sum.* It has been conceded by both parties that the appellant did not take any possessory actions. The question is not whether the appellant said he took such action but whether, in fact, such

action was taken. Taking is a matter of law. We find the reasoning of the trial judge erroneous.

In *Hardesty* the Court of Appeals said:

">... that Hardesty was deprived of the full use and enjoyment of his property by the Commission's action to a degree sufficient to constitute a taking..." *Id.* at 34.

After having previously held:

">... the right to abandon a condemnation proceeding ceases only when 'the authorized appropriation of land for public use has taken place.' *La Fontaine's Heirs, supra,* at 319." *Id.* at 33.

*Hardesty* is distinguishable from the case before us. In *Hardesty* Judge Murphy, for the Court, carefully explained the nature of a scenic easement as an example of:

">... a negative easement or servitude precluding the owner of land from doing an act, which, if no easement existed, he would be entitled to do. ..." *Id.* at 30.

At least three of the items considered by Judge Murphy in *Hardesty* are not present in this case; 1) the character of the property entered; 2) the immediacy of the public enjoyment; and 3) the legal restrictions on the property.

In this case there is nothing in the record before us that indicates that the appellant was prevented from the use of the subject property. On the contrary, there were in existence three commercial leases on the property when the petition was filed and the payment made into court. These leases continued in effect during the pendency of these proceedings and the appellee continued to collect and retain the rents.

Appellee's counsel admitted that there was no physical entry and that "[T]he property is still as it was in 1979." This was not a scenic easement of which occupancy or possession "is visual, not physical," or property which "was possessed by the public and appropriated to the purposes of the Commission."

It is not possible for the appellee to continue in its exclusive, unfettered use and enjoyment of its land including receiving the total proceeds from three leases and then claim that the appellant "has taken possession of the property and actually and lawfully appropriated it to the public purposes . . . ." Real Property Article § 12-102, *supra.*[2]

For the reasons set out above, we find the trial court erred and we reverse.

> *Ruling denying State's election to abandon condemnation reversed and case remanded for further proceedings.*
> *Costs to be paid by appellant.*

---

2. *See* Public Service Commission, et al. v. Highfield Water Company, et al., Court of Appeals, Misc. No. 8, Sept. 1980, filed February 26, 1982, at p. 14.