SHIFFLETT, et al. *v*. BALTIMORE
COUNTY, et al.

[No. 660, September Term, 1966.]

152

*Decided June 8, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*Lawrence E. Ensor* and *Paul T. McHenry,* with whom were
*Richard D. Payne* and *Payne & McHenry* on the brief, for ap-
pellants.

*Mrs. Jean G. Rogers, Assistant County Solicitor,* with whom
were *R. Bruce Alderman, County Solicitor* and *Harris James
George, Deputy County Solicitor* on the brief, for appellees.

OPPENHEIMER, J., delivered the opinion of the Court.

Owners of several junk yards in Baltimore County which
have been operated as valid non-conforming uses in a residential

area attack the constitutionality, at least as to them, of a county ordinance which requires the elimination of junk yards in all residential zones of the county within two years.

The ordinance involved was passed by the County Council of Baltimore County on October 19, 1962, as an amendment to the county's zoning regulations. It provides that any existing junk yards, as defined in the regulations, shall be completely eliminated not later than two years after the date the ordinance became effective, which was November 17, 1962. On November 17, 1964, two years after the effective date of the ordinance, Cecil Shifflett and members of his family, trading as Shifflett Brothers (Shifflett), and Lester P. Brown and members of his family, trading as Brown's Auto Parts (Brown), together with two other operators of junk yards, filed bills of complaint in the Circuit Court for Baltimore County, seeking to have the ordinance declared unconstitutional, at least as to them. The cases were consolidated and testimony was taken. At the hearing, it was stipulated that the yards of each of the complainants had the status of a non-conforming use. Judge Raine upheld the validity of the ordinance and denied injunctive relief. Only two of the four complainants, Shifflett and Brown, appealed from the decree.

Two legal questions are presented: whether the ordinance is a valid exercise of the police power; and, if it is, whether the two-year provision for elimination of non-conforming uses is unreasonable and therefore unconstitutional as applied to the appellants on the particular facts.

The principle is firmly established in this State that legislative bodies can require that non-conforming uses cease after a reasonable and appropriate specified time. *Grant v. City of Baltimore*, 212 Md. 301, 129 A. 2d 363 (1957); *Eutaw Enterprises, Inc. v. City of Baltimore*, 241 Md. 686, 217 A. 2d 348 (1966). See also *Stevens v. City of Salisbury*, 240 Md. 556, 573, 214 A. 2d 775 (1965), in which the Court expressly reaffirmed the holdings of *Grant*. We shall not repeat in detail the reasons for those holdings, summarized by Judge Hammond (now Chief Judge) in *Eutaw Enterprises*, as follows:

"[The appellant] had no vested right in the zoning classification under which it operated and no right to

expect that the classification of the property in which it operated would remain unchanged indefinitely. The ordinances, passed after deliberation and full consideration of expert and professional advice were general in application and drawn to apply in the same way, presently and in the future, to all similarly situated.

"As *Grant* suggested, there is no difference in kind, merely of degree, between a use which has been nonconforming since zoning began and one that is made nonconforming by a reclassifying ordinance, and, as *Grant* held, one in existence when zoning began may be required to stop. Because every zoning regulation affects property owned by someone at the time of its enactment, it brings about some curtailment of property rights either by restricting prospective uses or prohibiting existing ones. The prohibition of existing rights may be more likely to impose greater hardship or loss upon affected individuals than the restriction of prospective uses and that is one reason why we said in *Grant* at page 316: 'The significance and effect of difference in degree in any given case depends on circumstances, environment and length of the period allowed for amortization'." 241 Md. at 696.

At the hearing below, Mr. John G. Rose, Zoning Commissioner for Baltimore County, and Mr. George E. Gavrelis, the County Director of Planning, testified as to the reasons for the enactment of the ordinance. Junking activities were proliferating and expanding throughout the county. It was difficult to establish whether or not junk yards were non-conforming uses, because the zoning took effect in 1945 and memories as to when a particular use began were uncertain. The yards which possessed the status of non-conforming uses were not fading away, but were enjoying a monopoly to the detriment of their neighbors. Mr. Gavrelis testified that:

"A junk yard is, from a planning viewpoint, not compatible with residential area because it tends to be a varying and disconsonant kind of a land use. It has

aspects of blight in it in the sense that cars are stacked up, the junk yard is not sightly. There have been and there probably will be incidents of burning. The very introduction of junk activities with their esthetic aspects, the possibilities, at times, of noise, the fact that junk yards just are not a compatible use, there's a confrontation which really offends, I think, the residential development that exists or retards the possibilities for yet additional residential development near a junk yard."

He also testified that "the up-county areas are experiencing, for them at least, a rather fantastic growth." Judge Raine found that junk yards are incompatible uses within a residentially zoned area and the testimony supports his conclusion.

Junk yards are not a nuisance *per se,* and the use of property for such purposes is not in itself unlawful. *Town of Bladensburg v. Berg,* 216 Md. 292, 139 A. 2d 703 (1958). See also *Feldstein v. Lavale Zoning Bd.,* 246 Md. 204, 227 A. 2d 731 (1967). However, courts in other jurisdictions have found (although there are cases to the contrary) that the elimination of junk yards which enjoy the status of a non-conforming use in a residential neighborhood is a reasonable exercise of the police power, because of their nature or the manner in which they are conducted, if the time given for the elimination of the non-conforming use is adequate.

In *Harbison v. City of Buffalo,* 4 N. Y. 2d 553, 152 N. E. 2d 42 (1958), it was held, in a four to three decision, that a city ordinance requiring termination of the non-conforming use of premises as a junk yard within three years from the date of the ordinance was constitutional, if, in further proceedings, it was found that the resultant injury to the property owners was not so substantial that the ordinance would be unconstitutional as applied to the particular facts of the case. In delivering the opinion of the court,[1] Judge Froessel said:

---

1. As noted by Judge Barnes in his dissent in Stevens v. City of Salisbury, 240 Md. 556, 573, 214 A. 2d 775 (1965), two of the judges forming part of the majority concurred only in the result.

"If, therefore, a zoning ordinance provides a sufficient period of permitted nonconformity, it may further provide that at the end of such period the use must cease. This rule is analogous to that with respect to nonconforming structures. In ascertaining the reasonable period during which an owner of property must be allowed to continue a nonconforming use, a balance must be found between social harm and private injury. We cannot say that a legislative body may not in any case, after consideration of the factors involved, conclude that the termination of a use after a period of time sufficient to allow a property owner an opportunity to amortize his investment and make other plans is a valid method of solving the problem.

"To enunciate a contrary rule would mean that the use of land for such purposes as a tennis court, an open air skating rink, a junk yard or a parking lot—readily transferable to another site—at the date of the enactment of a zoning ordinance vests the owner thereof with the right to utilize the land in that manner in perpetuity, regardless of the changes in the neighborhood over the course of time. In the light of our ever expanding urban communities, such a rule appears to us to constitute an unwarranted restriction upon the Legislature in dealing with what has been described as 'One of the major problems in effective administration of modern zoning ordinances' (1951 Wis.L.Rev. 685). When the termination provisions are reasonable in the light of the nature of the business of the property owner, the improvements erected on the land, the character of the neighborhood, and the detriment caused the property owner, we may not hold them constitutionally invalid." 4 N. Y. 2d 562-63.

This is the same reasoning as that of this Court in *Grant* (cited with approval in *Harbison*) and *Eutaw Enterprises*.

*Spurgeon v. Board of Comm'rs of Shawnee County,* 181 Kan. 1008, 317 P. 2d 798 (1957), cited with approval in *Eutaw Enterprises,* held valid a county zoning resolution prohibiting the

non-conforming use of property as automobile wrecking yards within two years of the effective date of the resolution. *McKinney v. Riley,* 105 N. H. 249, 197 A. 2d 218 (1964), held valid an order made pursuant to an ordinance prohibiting the use of a non-conforming junk yard after one year. See also *Town of Schroeppel v. Spector,* 251 N. Y. S. 2d 233, 43 Misc. 2d 290 (Sup. Ct. 1963). *Contra* are *City of Akron v. Chapman,* 160 Ohio St. 382, 116 N. E. 2d 697 (1953) (holding invalid an ordinance prohibiting the non-conforming use of a junk yard after one year) and *City of Corpus Christi v. Allen,* 152 Tex. 137, 254 S. W. 2d 759 (1953). Authorities upholding prohibitions of certain land uses in analogous cases, including decisions of the Supreme Court, are set forth in *Grant, Eutaw Enterprises, Harbison* and Rathkopf, *Law of Zoning and Planning,* Chapter 62.

*Grant* upheld the prohibition of non-conforming outdoor advertising structures in residential areas in Baltimore after five years. *Eutaw Enterprises* upheld the prohibition of non-conforming check cashing and money changing operations in Baltimore residential and office use districts within an amortization period of eighteen months, when over five years had elapsed before the case was decided. In *Eutaw Enterprises,* Judge Hammond, for the Court, said that "the holdings of *Grant* control this case." 241 Md. at 696. In our judgment, the holdings of *Grant* and *Eutaw Enterprises* control the present case, insofar as it involves the general validity of the Baltimore County ordinance as a constitutional exercise of legislative power.[2] We turn, then, to a consideration of whether the ordinance is constitutional insofar as it applies to the particular situations of the appellants.

---

2. In Stevens v. City of Salisbury, 240 Md. 556, 214 A. 2d 775 (1965), the provisions of an ordinance restricting the height of barriers to unobstructed vision on certain portions of corner residential lots were held valid, but provisions requiring the property owners to destroy or reduce customary improvements at their own expense were held unconstitutional. Chief Judge Prescott, for the Court, said at 240 Md. 570 and 573: "[W]e do not believe the present situation presents a true case of amortization * * *. We reaffirm our holdings in Grant * * *."

Shifflett and Brown each own automobile junk yards in residential areas of the county. They deal in wrecked cars; the cars are towed to their yards and dismantled piece by piece. The parts are sold as replacements in other cars. After the cars are finally dismantled, the residue is sold for scrap. The yards are open twenty-four hours a day to receive the wrecked vehicles.

The Shifflett junk yard consists of five acres, a part of a larger tract. There are few residences in the area, the closest being approximately one-half mile away; the nearest development is four or five miles distant. Brown uses about twenty-five acres for his business. There are only seven or eight houses within a half-mile radius of the Brown junk yard, and no developments in the neighborhood. Judge Raine succinctly summarized the evidence as to the effect of the Shifflett and Brown junk yards upon the residential uses of the area as follows:

> "The evidence shows that their junk yards are so isolated, in such rural areas of the county, that there is no evidence of any immediate and direct deleterious effect on any specific member of the public or the public generally, since no one resides close by the junk yards. This argument cuts both ways since it is quite possible that their isolation stems from their objectionable nature. If the complainants' argument prevailed they could maintain their operation forever, simply by so conducting it that no person would ever consider living in the vicinity. The immediate effect of this law is directed against uses that have been allowed to exist in the past, but the general aim of zoning is to provide for orderly growth and development in the future. If this goal is to be achieved uses not compatible with residential zoning may be eliminated before full residential use of the area is made. The legislative power is broad enough to protect and preserve properly chosen residential zones, and the power may be exercised before there is an open clash of incompatible uses. In a situation of this type the public benefit might not be great, but it outweighs the harm to these complainants."

The only building on the Shifflett property is a twenty by twenty foot wooden structure, built by the owners at a cost for material of $500. It is built on runners and can be moved. On the Brown property, there are four houses and two frame buildings used for garages and storage of parts, one built in 1937 and the other in the 1940s. Each of the properties has a substantial value apart from its use as a junk yard. The evidence shows that the Shifflett property is worth at least $1000 an acre for the five acres which are cleared, and $500 an acre for the remaining wooded property. (Shifflett, in a pre-trial deposition, valued the cleared area at $2500 a half acre, and the uncleared portion at $1000 an acre). Brown testified that the present value of his land, apart from the permanent structures, is about $100,000.

Under the Baltimore County zoning regulations, junk yards are permitted only in a "Manufacturing Heavy" zone, by special exception. See Baltimore County Zoning Regs. §270. Shifflett and Brown testified, in general terms, that it would be expensive to move their junking operations, but neither offered any testimony that he was unable to obtain other land in a Manufacturing Heavy Zone, or as to the price of such land, or as to any anticipated difficulty in obtaining the necessary special exception.

In their bills of complaint, Shifflett and Brown each alleged that he would need five years to obtain full and fair compensation for the automobiles then in his junk yard. At the trial, however, each doubled the period. Shifflett testified that he would need ten years "to phase out" his business without great loss. Brown testified that he would need a similar period to dispose of the automobiles presently on his lot. These general conclusions, however, are not supported by the specific testimony.

In his bill of complaint filed in November, 1964, Shifflett alleged that he had approximately 500 automobiles upon his lot. At the hearing, however, he testified that he had 1000 cars on the lot in 1964. He estimated the number in 1963 at 1200, and the number at the time of the hearing, as well as in 1965, at approximately 1000. Brown, in his bill of complaint, alleged he had 1000 vehicles in his junk yard. At the trial, however, he

testified that he had 3000 cars in 1964, and had had about the same number in his yard since 1963.

Despite his testimony as to the time required to dispose of his cars, Shifflett testified that it generally took only three or four months to get back the price paid for a wrecked vehicle. Leo C. Hoffmeister, one of the original complainants, who also maintained an automobile junk yard, testified that in 1964 he had 1000 cars which were disposed of in about a year.

It is undisputed that neither appellant, after the passage of the ordinance, began an orderly liquidation of his stock of wrecked cars or attempted to set up another place of business for them. On the contrary, each continued to buy additional wrecks. In *McKinney v. Riley, supra,* in upholding the validity of a 1956 ordinance which required the appellee to give up his non-conforming use of an automobile junk yard, the Supreme Court of New Hampshire said:

> "The defendant here had ample warning in 1957, when his application was denied, that his conduct of the business was considered a violation of the ordinance. Yet he continued to conduct a greatly expanded nonconforming use until the operations were held to be a public and private nuisance." 197 A. 2d at 222.

In *Town of Schroeppel, supra,* the ordinance proscribed the non-conforming use of junk yards after three years. The court said:

> "The defendants, however, ignored the existence of the ordinance and continued to pile more junks on this property. They should not now be heard to complain of the 'hardship' which they themselves multiplied." 251 N. Y. S. 2d at 237.

While the ordinance here involved became effective in November, 1962, the bills of complaint were not filed until two years thereafter. In *Eutaw Enterprises,* the Court said:

> "In the present case the reasonableness of the eighteen months' period of grace need not be passed on as a basis of decision. Because of the length of time the

162

litigation has dragged on, during which Stan's has continued uninterruptedly to cash checks, Eutaw and the Church have had some five and a half years since November 1960 when Ordinance 465 was passed to enjoy and profit from Eutaw's operation at 1202 Eutaw Place." 241 Md. at 697-98.

Similarly, in this case, the reasonableness of the two-year period of grace need not be determined. The appellants have had four and a half years from the effective date of the ordinance to liquidate the automobiles in their junk yards or to move them elsewhere. In the light of all the testimony, we cannot say that this period was unreasonable.

That the appellants' land may be less profitable if used for residential purposes, and that the moving of their businesses may entail substantial expense, are not, of themselves, controlling considerations. *Grant*, at 212 Md. 322. See also *City of Baltimore v. Borinsky*, 239 Md. 611, 622, 212 A. 2d 508 (1965), and cases therein cited.

In view of all the circumstances, we find that the ordinance was not unreasonable or invalid in its application to either of the appellants.

*Decree affirmed; costs to be paid by appellants.*