## RANDOLPH HILLS, INC. *v.* WHITLEY, ET AL.

[No. 81, September Term, 1967.]

*Decided February 21, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Joe M. Kyle,* with whom were *Kyle & Jorgensen* on the brief, for appellant.

*Howard J. Thomas,* with whom were *Bradshaw, Thomas & Yeatman* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court. BARNES, J., concurred in part and dissented in part and filed a separate opinion; see page 90, *infra.*

This will be the last, we hope, of the *Marcus,*[1] *Baker,*[2] *Wahler,*[3] *Randolph Hills*[4] tetralogy. The properties involved in these four cases are contiguous and a part of the property in this case was before us in *Baker.* It is at once apparent that *Marcus, Baker* and *Wahler* will be required reading for anyone seeking a full understanding of this opinion. It should be observed, perhaps, that *Wahler* was argued the day before this case was argued and that it was decided only two days before our decision here.

It will be less confusing, more convenient, but perhaps somewhat less elegant, to refer to the triangular 62 acre tract which

---

1. *Marcus v. Montgomery County,* 235 Md. 535, 201 A. 2d 777 (1964).

2. *Baker v. Montgomery County,* 241 Md. 178, 215 A. 2d 831 (1966).

3. *Wahler v. Montgomery County,* 248 Md. 62, 238 A. 2d 266 (1968).

4. The case at bar.

has become our concern as the subject property.[5] Its northern boundary, also the base of the triangle (the apex is to the south), runs for most of its 2600 feet along Jingle Lane and Briggs Road. The southeastern side, about 1500 feet, fronts on Layhill Road, a busy thoroughfare. The southwestern side, about 2400 feet, abuts the *Marcus* tract, the *Wahler* tract, some R-90 property and some R-T property. It joins the base of the triangle at Jingle Lane. For rezoning purposes the tract was divided into 3 unequal parcels. R-T zoning was requested for the 6.4 acre parcel on the west, part of which fronts on Jingle Lane. R-T or R-20 was requested for the 5.9 acre center parcel. R-20 was requested for the 49.6 acre eastern parcel, about half of which is the property for which R-20 was sought in *Baker*. Most of the subject property is wooded although some parts of it have been cleared. The eastern and center parcels are relatively level. The western parcel is rolling.

All of the land for one-half mile north of the subject property is zoned R-90. Beyond that the zoning is R-R (Rural Residential). One finds throughout this area scattered single family residences and vacant land. To the west is a large subdivision known as Foxhall, zoned R-90. To the east across Layhill Road is the Layhill South Subdivision, a portion of which is wooded and which contains a number of large, new, single family residences. To the south and southwest are the *Marcus* tract, which is zoned R-30, the *Wahler* tract (now R-60), a church and 4.2 acres recently zoned R-T. Everything else is R-90. All of the land on the southwest side of Georgia Avenue, except 4 acres of R-T, is zoned R-60.

When the Council adopted its resolution (9 August 1966) there had been pending for some time two condemnation suits initiated by the Montgomery County School Board, one of which sought the acquisition of about 40% of the eastern parcel; the other sought to acquire nearly 65% of the center and western parcels. The Council excluded both areas from its resolution.

---

5. Randolph Hills, Inc., the appellant, is the contract purchaser of the subject property. The Council did not appeal.

The technical staff recommended denial of all three applications. The Planning Board approved the recommendation of the staff and recommended to the Council the rejection of the three applications. Noting the disapproval of a number of earlier (since 1955) applications for the rezoning of parts of the subject property, the staff was of the opinion "that multi-family zoning should not be permitted to expand at this location." The staff found that "the existing R-30 zoning [*Marcus* tract] to the south serves as a more than adequate buffer between the commercial center located farther to the south and the area to the north which was planned and zoned for single family residential development." The existing multi-family area, it went on to say, "is of a sufficient depth and arranged in such a manner so as to require, in the staff's opinion, *no further expansion.*" (Emphasis supplied.) The staff also felt the rezoning "would generate a vastly increased amount of traffic, compounding the already overcrowded and oftentimes dangerous existing situation in this area."

After a hearing on 3 June 1966 the Council adopted 3 resolutions. In respect of the western parcel, after expressing disagreement with the Planning Board and its staff, it reclassified the remaining (after excluding the school site, etc.) 2.5731 acres from R-90 to R-T. The Council was of the opinion the "Glenmont area has changed from that of a single-family residential community to that of a rapidly expanding combination of commercial and multiple-family uses." Reference was made to its statement in *Marcus* that the R-30 classification in that case would provide " 'a nice transition between commercial and R-90 zoning.' " But, the Council went on, "since that decision * * * the * * * area has continued on its rapid expansion of commercial and apartment uses. Thus, the Council *finds no justification for holding the line at the same points as were warranted in 1963. It would seem more logical to extend apartment use to P-14 [Briggs Road] at this time.*" (Emphasis supplied.) It found further that "the granting of * * * [the] application * * * [would] have no detrimental effects to the use or development of the adjacent properties or to the neighborhood."

The second resolution, virtually a facsimile of the first, re-

classified the remaining 2.0641 acres in the center parcel from R-90 to R-20. The third resolution, also a virtual facsimile of the first and second, reclassified the remaining 25.3284 acres in the eastern parcel from R-90 to R-20.

The appeal to the circuit court was heard by Judge Pugh on 9 February 1967. The proceedings were not reported. On 28 February Judge Pugh reversed the decisions of the Council and filed an opinion stating his reasons for so doing. "To say that there has been a substantial change in the character of the neighborhood," he announced, "would be mere folly and not based upon a proper consideration of the actual situation." We think Judge Pugh reached the correct result.

## I.

Appellant contends the testimony of Leslie Williams, an expert whose qualifications are indeed impressive, makes the question of mistake in the original zoning of 1954 fairly debatable. *In limine,* it should be recalled that the Master Plan, adopted by the Planning Commission in April 1961 continued the subject property in the R-90 classification. In *Marcus* (1964) the Council seemed content to continue R-90 and expressed satisfaction that the R-90 would be protected by the *Marcus* buffer. In *Baker* (1966) no effort was made to show that there had been a mistake in the original zoning. In *Wahler* the issue of mistake was not raised. Indeed, neither the Council nor the Planning Board nor its staff touched upon the subject of mistake in any of the opinions filed in the instant case.

Mr. Williams was a skilled, articulate witness and he did go on. He thought "great mistakes" had been made in the master plan. He said there was "no recognition whatsoever of the interrelationship of transportation facilities, such as major highways, and the effect it would have upon land development itself." He pointed to the "tremendous effect" the "Outer Circumferential Freeway" and the "Northern Parkway" and the proposed interchanges will have on the area. Although these roads are a long way from reality they are shown on the master plan. Also shown are the proposed interchanges to which Mr. Williams referred. All of them are shown to be within a mile of the subject property. Oddly enough, he admitted he "did not

make any study as to how the plan was developed." It is entirely clear that if Mr. Williams had been employed to develop the master plan probably he would have done it somewhat differently. That is not to say, however, that the plan, as developed, is a mistake or that it contains mistakes. If mistakes there are, neither Mr. Williams nor any other witness has shown how the proposed rezoning of the subject property will correct them. In our judgment there is nothing in this record which would make the issue of original mistake fairly debatable and that is very likely why the Council was careful to observe, in its opinion, merely, "that the Master Plan's recommendations for the Glenmont area are *unrealistic* in that they do not take into consideration the impact of the *recent intense* land usage in this area." (Emphasis supplied.)

## II.

To support its contention that the evidence in respect of substantial change in the character of the neighborhood was fairly debatable appellant relies on the testimony of Donald G. Shook, a planning and zoning consultant whose qualifications as an expert are not disputed. Since Mr. Shook lists more than 80 zoning changes since 1946 in support of his opinion, it becomes necessary to consider his testimony and his written report in some detail.

It is immediately evident that most of the rezonings cited by Mr. Shook have no relevance here. Properties 2, 3 and more miles distant are not within the neighborhood and whatever may have happened to them is not evidence of substantial change in the character of this neighborhood. *Woodlawn Association v. Board,* 241 Md. 187, 216 A. 2d 149 (1966). Many of the rezonings cited were actually in conformity with the master plan. Many were changes to a commercial classification in unmistakably commercial areas. The fact that appellant relies only on the few having any real relevance obviates the necessity of discussing any more of them. We shall treat them in the order in which they appear in appellant's brief.

## (i)

The *Wahler* property, having reverted to its original R-60 classification, no longer has any relevance. The 4.2 acre parcel

changed from R-60 to R-T, discussed in *Wahler,* does not constitute evidence of a substantial change in the character of the neighborhood.

(ii)

This is a 4.1 acre tract close to the junction of Georgia Avenue and Layhill Road, with frontage on both of those heavily traveled thoroughfares, which was changed from R-90 to C-1 (Commercial) on 15 February 1966. It is a part of the commercial area referred to in *Marcus.* It will be recalled that *Marcus* was to "provide a nice transition between commercial [this 4.1 acre tract] and R-90 zoning [the subject property]." To argue that this is evidence of a substantial change in the character of the R-90 area is baying at the moon.

(iii)

When the 70 foot road (P-9) described in *Wahler* was realigned and relocated, the 73,269 square feet it had occupied was changed from R-90 to R-30 to conform with the land (*Marcus* tract) abutting on both sides. Brandishing this as evidence of change is indeed *de minimis.*

(iv)

On 26 April 1966, 5 properties totaling 20 acres, on Hewitt Avenue and Georgia Avenue were changed from R-90 to R-20. Appellant admits they are at least 3500 feet northwest of the subject property. The master plan indicates they are also within 1000 feet of the proposed interchange between the proposed Outer Circumferential Beltway and Georgia Avenue. We fail to see what those rezonings might have to do with the character of this neighborhood. *Woodlawn, supra.*

(v)

In March 1966, 2 acres were added to an existing R-20 area on Shorefield Road which is a mile, at least, from the subject property, across Layhill Road and 2000 feet south of Randolph Road. (Perhaps it would be helpful to point out that Georgia Avenue runs in a northerly direction as it approaches the Glenmont area. Shorefield Road turns off at right angles to the east. 2000 feet further north Randolph Road branches off to the northeast. Georgia Avenue then turns gradually to the northwest and in about 1000 feet Layhill Road branches off to the right and

runs almost due north. Georgia Avenue continues on in a northwesterly direction.) This change can have no conceivable effect on the character of the neighborhood of the subject property.

(vi)

In September 1964, 6.7 acres was added to the large R-30 area south of Randolph Road. The tract is nearly a mile from the subject property.

(vii)

In February 1965, two parcels totaling 3 acres were changed from R-90 to R-30. They lie between the Marcus tract and Layhill Road. They fill out the "nice transition" between commercial and R-90 in the sector [6] formed by Georgia Avenue and Layhill Road. Rather than furnish evidence of a substantial change in the character of the neighborhood this rezoning completes the plan the Council devised to protect its character.

(viii)

The Council, on 1 December 1964, created two R-T areas about 1200 feet from the subject property and on the opposite (southwest) side of Georgia Avenue. They have no significance here for the same reasons set forth in *Wahler.*

(ix)

On 5 July 1966, after the hearing but before its decision in the instant case, the Council reclassified about 65 acres across Layhill Road from the subject property. One first must visualize the sector formed by Randolph Road on the east and Georgia Avenue and Layhill Road on the west. At the apex of the sector is the Glenmont Shopping Center. Abutting the shopping center to the north is a band of R-30 zoning running from Layhill Road to Randolph Road. 1600 feet further north is the Layhill South Subdivision, all of which is R-90. The 65 acre tract forms a belt about 800 feet wide running from Layhill Road to Randolph Road. In short, it is nearly all of the land lying between the R-30 belt north of the shopping center and the Layhill South Subdivision. 27 of the 65 acres were changed

---

6. The geometrical shape resembling a piece of a pie.

from R-90 to R-30. 20 acres were changed from R-90 to R-20. 17 acres were put in the R-T classification.[7]

It seems to us the Council was simply repeating what it had already done in the Georgia Avenue-Layhill Road sector. It was providing, as it did in *Marcus,* a "nice transition" from the shopping center commercial to the R-90 and R-R areas to the north. It would scarcely seem to follow because the Council chose to do this in a slightly different fashion (i.e., by creating some R-20, buffered by R-T [8]) that the earlier plan (*Marcus*) should be abandoned. Since we look upon it as a plan designed to protect and stabilize the R-90 area (Layhill South Subdivision) which adjoins the subject property on the east, we do not see how it can be considered as evidence of substantial change in the character of the neighborhood of the subject property.

(x)

Finally, appellant cites the changes relied upon in *Marcus.* They are the fire engine house and the police station at Georgia Avenue and Randolph Road, the Glenmont Shopping Center, the Americana Apartments south of Randolph Road, the widening of roads and the enlargement of sewers. Since these changes were relied upon (in *Marcus*) to support the R-30 "transition" established to protect the subject property and the other R-90 properties to the north, it now seems rather footless to try to use them to accomplish the ruin of that protective device. Oddly enough, none of these changes was relied on by the applicant in *Baker.*

We see in this record no evidence of changes in conditions sufficient to make the issue of substantial change in the character of the neighborhood fairly debatable.

---

7. After this opinion had been written but before it had been adopted by the Court it was learned from sources *dehors* the record that the application for R-T zoning in respect of 6 of the 17 acres was withdrawn and that the application in respect of the remainder was denied by the Council. A portion of the 6 acre tract, it is believed, will be included in the site for the Winexburg Elementary School. The zoning of the 17 acres, therefore, would remain R-90.

8. R-T could be considered R-90 if the information in footnote 7 were a part of the record. The effect, however, would be the same.

## III.

Appellant contends it is entitled, at least, to keep the R-T zoning of the remainder (2.5731 acres) of the western parcel. It argues that "the testimony of Mr. Williams and Mr. Shook that the proposed R-T zoning is compatible with the neighboring R-90 property is uncontradicted." The only statement, in which R-T is mentioned, that we have been able to discover in Mr. Williams' testimony (or statement) is:

> "The requested R-T and R-20 residential density blends with existing residential development and with other R-T, R-20 and R-30 zoning in adjoining tracts to form a coordinated land pattern with Glenmont civic, institutional and commercial uses that already have grown into a satellite community nucleus at the important and strategic junction of State Routes 97, 183 and 182, namely Georgia Avenue, Randolph Road and Layhill Road.
>
> * * *
>
> "Rezoning for R-T and R-20 on this tract is positive zoning. It permits appropriate residential densities in accordance with underlying development policies respondent to forces affecting change from outside Glenmont and in accord with efficient use of land so located as is subject tract."

It has rhythm and sonority but we do not see anything touching on the compatibility of this R-T zoning with the surrounding property. Mr. Shook seems not to have mentioned the subject at all. The technical staff made no mention of the requested R-T zoning other than to recommend its denial. The Planning Board expressed no opinion, contenting itself with approval of the staff's statement "as generally stating the Board's opinion."

In the opinion of the Council there is this paragraph:

> "The Council further finds that the granting of this application will have no detrimental effects to the use or development of the adjacent properties or to the neighborhood."

One wonders what this language was intended to mean when one discovers that precisely the same language appears in the

other two opinions dealing with R-20 zoning. If it is contended (it was not) that this represents compliance with what we said in *Bujno v. Montgomery Co. Coun.*, 243 Md. 110, 220 A. 2d 126 (1966), then we must demur. There Judge Barnes, for the Court, said:

"The appellants also seek to distinguish *Beall* from the case at bar on the ground that in *Beall* the Technical Staff, the Planning Board and the Council all indicated that the application complied with the purposes of the R-H zone whereas in the case at bar, the Technical Staff and Planning Board did not indicate this and the Council sought to justify its action by a finding that there had been sufficient change in the character of the neighborhood. We point out that the order of the Council in the case at bar was filed on December 18, 1964, several months *before* our decision in *Beall* which was decided on August 27, 1965, so that the Council did not have the benefit of the *Beall* opinion *in which we indicated there should be a finding that the proposal for R-H zoning complied with the purposes of that zone.* Although *it is most desirable that the Council should find specifically that the proposal does comply with the R-H zone purposes,* this finding may be inferred from the Council's opinion even though, as a matter of abundant caution perhaps, it also found that there had been a sufficient change of conditions in the neighborhood to justify the proposed reclassification." *Id.* at 118-19. (Emphasis supplied.)

It will be observed that the Council, in the case at bar, had the benefit of our holdings in *Beall v. Montgomery County,* 240 Md. 77, 212 A. 2d 751 (1965), *Knudsen v. Montgomery County,* 241 Md. 436, 217 A. 2d 97 (1966), and *Bujno.*

We shall not undertake to delimit the finding which must be made by the Council to sustain an R-T zoning, nor to suggest the nature and amount of evidence which should be produced in support thereof, as these considerations will vary from case to case. We do not hesitate to say, however, that neither the finding nor the evidence in the case at bar comes anywhere near

being adequate to sustain the R-T classification. Cf. *Bigenho v. Montgomery County,* 248 Md. 386, 237 A. 2d 53 (1968).

### IV.

All things considered, it seems fair to say that the real basis for the Council's decision is a present desire to relocate the boundary between the R-30 area and the R-90 area. Its statement, part of which was quoted earlier, is as follows:

> "The Council is of the opinion that the Glenmont area has changed from that of a single-family residential community to that of a rapidly expanding combination of commercial and multiple-family uses. Indeed, the Council has so found in the rezoning of the property in Application No. C-965 [*Marcus* tract]. In that opinion, dated May 21, 1963, the Council felt that the reclassification to R-30 would provide 'a nice transition between commercial and R-90 zoning.' Since that decision, however, the Glenmont area has continued on its rapid expansion of commercial and apartment uses. *Thus, the Council finds no justification for holding the line at the same points as were warranted in 1963. It would seem more logical to extend the apartment use to P-14 at this time.*" (Emphasis supplied.)

This seems to us to be a text-book example of the "mere impermissible change of mind or heart" referred to in *Polinger v. Briefs,* 244 Md. 538, 541, 224 A. 2d 460 (1966), and condemned in *Kay Const. Co. v. County Council,* 227 Md. 479, 177 A. 2d 694 (1962) and *Schultze v. Montgomery County Bd.,* 230 Md. 76, 185 A. 2d 502 (1962). If the Council can do this today, then there is no reason why it cannot extend the line 1000 feet further north next month, 1500 feet the following month, and so on, ad infinitum.

Other questions were presented but in view of what we have said we do not think they require our consideration. We shall, therefore, affirm Judge Pugh's order of 23 February 1967 reversing the decision of the Montgomery County Council and its resolutions in Zoning Cases C-757, C-758 and C-759.

*Order affirmed.*
*Costs to be paid by appellant.*

BARNES, J., concurring in part and dissenting in part:

I concur in Part III of the majority opinion which holds that the Council did not make the required finding that the R-T zone application complied with the purposes and criteria established by the Zoning Ordinance for granting an application for R-T zoning. As the majority points out, the Council had the benefit of our decisions in *Beall v. Montgomery County Council,* 240 Md. 77, 212 A. 2d 751 (1965), *Knudsen v. Montgomery County,* 241 Md. 436, 217 A. 2d 97 (1966) and *Bujno v. Montgomery County Council,* 243 Md. 110, 220 A. 2d 126 (1966). I do not think it is necessary for the decision to state that the evidence in the case is insufficient to support such a finding if the Council had made it, and I express no opinion on this point.

I dissent, however, from the decision of the majority in Parts I, II and IV, principally for the reasons already set out in my dissent in *Wahler v. Montgomery County,* 248 Md. 62, 238 A. 2d 266 (1968), and also in my dissent in *Woodlawn Association v. Board,* 241 Md. 187, 216 A. 2d 149 (1966).

As I read the testimony of Leslie Williams, there was sufficient evidence on which the Council, as reasonable legislators, could have found that there was a mistake in the original zoning. As an expert witness he stated that, in his opinion, there had been such a mistake and gave his reasons for that opinion. The principal reason why a mistake in the original zoning is deemed to have occurred, is, I take it, that the original zoning failed to take into account the proper future development of the land in question and, I would think, the testimony in regard to what the future development had in fact been is quite relevant to the issue. In my opinion the Council sufficiently indicated that there was a mistake in original zoning and there was sufficient evidence to support that finding.

I have already indicated in *Wahler* that, in my opinion, the R-T zoning across the street from the subject property in that case was, in itself, sufficient evidence of a "change in conditions" in the neighborhod to justify the Council's granting the rezoning in that case. It would also be sufficient to support the rezoning in the present case, as the subject property in this case is in the "neighborhood" of the subject property in *Wahler.*

In the present case, however, there was additional evidence of "changes" given by the expert witness, Donald G. Shook, which could also justify the Council in concluding that there had been a change of conditions in the neighborhood. In view of the lack of definition by this Court of the criteria that govern the application of the "change in conditions" portion of the "change-mistake" rule, the careful expert, quite naturally I think, gives every possible "change" which conceivably could have a bearing on the issue. We have never defined what land lies within the "neighborhood," although we have frequently indicated in a particular case that certain "changes" did not occur within the neighborhood or did not result in a change in the "character" of the neighborhood. But, alas, we have not established the criteria of what does change "the character" of a "neighborhood." Under these circumstances, like the policeman in Gilbert and Sullivan's "Pirates of Penzance", Act II (1879), "the lot" of the Technical Staffs, Planning Boards or Commissions, legislative bodies and trial courts "is not a happy one." As pointed out in *Beth Tfiloh v. Blum*, 242 Md. 84, 218 A. 2d 29 (1966), Judge Raine of the Circuit Court for Baltimore County, has said as much. They have my sympathy. The fundamental error, to my mind, is in the "change-mistake" rule itself as I indicated in my dissent in *MacDonald v. Board of County Commissioners for Prince George's County,* 238 Md. 549, 576-601, 210 A. 2d 325, 340-354 (1965). In that dissent I pointed out that one of the unfortunate results of the "change-mistake" rule was that it glorified and embalmed the *status quo* in zoning, which is a far too developing and economically significant area of law for the *status quo* to be long continued. The second by-product of the unsound rule is the uncertainty of the application of the rule. When we attempt to play the zoning score by ear, rather than by note, a lack of harmony inevitably results. The decisions in *Wahler* and in the present case, in my opinion, graphically illustrate this point. The expansion of the "buffer zone" recommended by the Technical Staff, concurred in by the Planning Board, adopted by the legislative body and approved by the Circuit Court was held by the majority of the Court in *Wahler* to be improper. On the other hand, a recommendation by the Technical Staff that the

"buffer zone" be not further expanded, concurred in by the Planning Board, but not adopted by the legislative body, was held to be proper in this case and the order of the Circuit Court reversing the decision of the Council will be sustained. These two cases are in the same "neighborhood" on any criteria. This lack of defined criteria of what constitutes a "change in conditions" and the uncertainty of result in a particular case not only impairs the ability of counsel to advise their clients on what their rights are likely to be in a given factual situation, but makes the administration of the zoning law by the local officials, both legislative and administrative, a difficult matter indeed. This uncertainty also breeds litigation as the many zoning cases in the trial courts and in this Court attest. This is *most unfortunate.*

It is difficult for me to understand how the rezoning of the 65 acre tract across Layhill Road from the subject property is not also a "change in conditions" sufficient to justify the rezoning to R-20 in the present case. In the rezoning of the 65 acre tract, 27 acres were rezoned from R-90 to R-30, 20 acres were changed from R-90 to R-20 and 17 acres were rezoned to the R-T classification. A portion of the rezoned R-20 land is directly across Layhill Road from the subject property. As the majority opinion points out, this 65 acre tract forms a belt about 800 feet wide running from Layhill Road to Randolph Road. If this rezoning would not result in a change in the character of the neighborhood, I cannot think of a change that would, whether or not it forms a "nice transition" from "the shopping center commercial to the R-90 and R-R areas to the north," as the majority indicates. It is, in my opinion, still a "change" and a change in the character of the neighborhood.

Part IV of the majority opinion indicates that the Council desired in the present case "to relocate the boundary between the R-30 area and the R-90 area" and quotes from the opinion of the Council that it found that the Glenmont area had changed from a single-family residential community to that of a rapidly expanding combination of commercial and multiple-family uses, that since the decision in the *Marcus* case the area had "continued on its rapid expansion of commercial and apartment uses," and for those reasons it found "no justification for hold-

ing the line at the same points as were warranted in 1963. It would seem more logical to extend the apartment use to R-14 at this time." It is then stated in the majority opinion that this is considered to be a "text-book example of a 'mere impermissible change of mind or heart' " referred to in several cases. The Council granted the rezoning in the present case on August 9, 1966.

The mere passage of time—approximately three years—in the volatile zoning situation you have in Montgomery County, with the great influx of population and the almost daily changes in land values and living conditions, would seem to me to preclude the likelihood that the situation was substantially the same as the situation in 1963. The Council affirmatively found that the situation had changed in three years. The "mere change of mind" finding is only permissible when the situations involved are substantially the same.

I see no reason, however, why a legislative body, if it deems that it had previously made a mistake, cannot constitutionally "change its mind" and, if zoning concepts have changed or the over-all situation has changed, might not properly reach a different conclusion from one reached previously. Courts, although bound to apply the doctrine of *stare decisis,* reserve the right to "change their minds" if convinced an original decision was in error. I would think this right to "change one's mind" would be even more applicable to *legislative bodies.* The true test, as I see it, in every case is whether the legislative action is arbitrary, unreasonable and capricious; if the action is not, it should be upheld. I cannot think that the Council's action in the present case is unreasonable, arbitrary or capricious. On the contrary, the action seems to me to be entirely reasonable and should be affirmed.

I would affirm as to Part III in regard to the R-T rezoning, but reverse as to Parts I, II and IV.