MINOR ET AL. *v.* SHIFFLETT ET AL.

[No. 7, September Term, 1968.]

*Decided January 15, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Philip O. Foard* and *George W. White, Jr.,* with whom were

*Buckmaster, White, Mindel & Clarke* on the brief, for appellants.

*Richard D. Payne* for appellees.

SMITH, J., delivered the opinion of the Court. BARNES, J., concurred in the result and filed a concurring opinion. (See p. 168, *infra.*)

Appellees (Shifflett) have operated an automobile junk yard at their present location in the extreme western section of Baltimore County since about 1932. The zone in which they are located is an R-40 zone. Their use has been a nonconforming use since the adoption of zoning in Baltimore County in 1945.

Shifflett is no stranger to this Court. See *Shifflett v. Baltimore County,* 247 Md. 151, 230 A. 2d 310 (1967) wherein we upheld the validity of the Baltimore County ordinance adopted in 1962 requiring the elimination of junk yards in all residential zones of the county within two years.

Shifflett applied to the Zoning Commissioner of Baltimore County for a reclassification of his property to an MH zone and for the granting of a special exception pursuant to the Zoning Law and Zoning Regulations of Baltimore County permitting a junk yard. The reasons assigned were error in original zoning and change in the neighborhood. The request was denied.

Appeal was entered to the County Board of Appeals of Baltimore County. That Board denied reclassification of the entire 30.5 acre tract but did grant reclassification of the five acre parcel of ground on which the junk yard was located. It likewise granted the special exception.

Appellants appealed to the Circuit Court for Baltimore County which court affirmed the decision of the Board of Appeals. This appeal followed. For the reasons hereinafter set forth we hold the reclassification should have been denied.

Junk yards are not permitted in any zone in Baltimore County except in an MH zone and then only by special exception.

The area in question lies just north of Patapsco State Park. It is located "as the crow flies" almost a mile from an MLR

160

zone. With that exception, the land for quite some distance around the subject property is classified for residential use.

The zoning map in question was adopted on November 15, 1962. The area was zoned as residential, however, from the adoption of zoning in Baltimore County in 1945.

The M.H. classification (manufacturing heavy) is the most liberal of the zones in Baltimore County as to the uses permitted therein.

Shifflett presented testimony of five witnesses other than himself. Their testimony was devoted almost entirely to the long standing use of the property for junk yard purposes. It is conceded that the junk yard operation is carried on on the five acre portion for which the special exception was requested.

The Shifflett witnesses mentioned the one time existence of a quarry on subject property. The only portion of their testimony concerned with surrounding property was that of the witness Duvall who said there were about 20 houses in about a three mile section of Wright's Mill Road from Dogwood Road around the loop back to Old Court Road.

Access to subject property is by Wright's Mill Road, the paved portion of which was said to be nine feet in width at the subject property.

Although Mr. Gavrelis, Director of Planning for Baltimore County, connected with the County Planning Department since 1951, testified on cross examination (having been called as a witness by the protestants) that at the time of the adoption of the zoning map by the Planning Board he personally had no knowledge of the industrial use of Shifflett, and Shifflett regarded this in this Court as evidence of error in original zoning, no other evidence was presented as to the knowledge or lack of knowledge of the Baltimore County Zoning authorities as to the use of the land for junk yard purposes. The Board of Appeals found as a fact that the property had been used as an automobile junk yard since prior to 1945 and that if it were not for Section 200.16 of the Zoning Regulations it would presently enjoy a legal nonconforming use as a junk yard. In finding error in the original zoning the Board said:

*"There was no testimony of any substantial change in the character of the neighborhood since the adop-*

*tion of the map in 1962,* however, the Board feels that the zoning on the subject property is erroneous in that the Planning Staff, prior to the adoption of the map, was apparently unaware of the existing commercial use on the property, and consequently did not even consider recommending zoning on the property that would allow the commercial use of the land to continue, even though apparently (from Cecil Shifflett's testimony) in 1962 the petitioner had an inventory of cars valued at $97,000 located on the property. It seems to the Board that to properly adopt a land use map the County should endeavor to determine existing land uses of properties, and in cases where feasible, adopt zoning that would allow existing businesses to continue their operation as long as they are not detrimental to the general health, safety, and welfare of the public. The testimony in this case indicated that very few, if any, persons can actually see the junk operation on the tract, and, as cited above, several witnesses testified that they knew of the use of the property but that it had not adversely affected them. Indeed, the overlooking of the existing use of this property by the Planning Staff would indicate that the junk operation is so remote and screened from public view that very few people are even aware of its existence." (emphasis added)

In sustaining the action of the Board of Appeals the Circuit Court said in part:

"The evidence of original error in the instant matter seems crystal clear. The Junk Yard business was in existence long before the zoning map was adopted in 1962. Mr. George Gavrelis, Director of Planning for Baltimore County, admitted under oath, that his staff was not aware of the existence of the Junk Yard when they prepared the zoning map. Further, the owner, Cecil Shifflett, has a substantial investment in his business approaching $300,000."

A careful reading of the record does not disclose any state-

ment on the part of Mr. Gavrelis wherein he said that his staff was not aware of the existence of the junk yard when they prepared the zoning map. Interestingly enough, no such statement is cited in Shifflett's brief. It is true, as Shifflett's brief stated, that in response to a question of Mr. Baldwin of the Board of Appeals Mr. Gavrelis stated that the Planning Board in making its recommendation normally considers the existing uses of the property. The next series of questions and answers went, however, as follows:

"Q. And usually you try to recognize, say if I have a nonconforming gas station, or a grocery store, or something along the road, you usually try to recognize the existing commercial or industrial uses, don't you? A. In all fairness, I would have to say not always.

"Q. I don't mean in every case. A. They are identified, and from a planning viewpoint, and if it seems they do make sense as part of the zoning fabric, commercial zoning or what is recommended to the Board, but on the other hand, if the property has no zoning status, if it is a nonconforming use, and from a staff viewpoint, and from the Board viewpoint, it is felt that the establishment of zoning potentials is incompatible, the recommendation is made it retain its nonconforming status."

Mr. Gavrelis also testified as follows in response to a series of questions about the lack of an MH zone on the Western Area Map:

"Q. Wouldn't you, normally, in adopting a map, somewhat try to balance the land use? A. No, not at all. Again, if you examine the zoning regulations, I think you will find that the M-L-R, and the M-L zones, are rather permissive, and the distinction between essentially M-L and M-H is that the M-H starts to introduce the more, I will call it heavy type of industries, like steel mills, or refineries, or refractories, the ones that potentially have more nuisance and/or developed in very large complexes, and basically, I

think that is the feeling of the planning staff, and I am sure the Planning Board, this kind of zoning, which perhaps has an inherent requirement for access to either rail or port, rather than simply the expressway system, just didn't seem to be appropriate in this portion of the county.

"I do recall we had some M-H zoning in the 13th District, where we had some concentration of rail access.

"Q. Certainly a 5-acre junk yard doesn't require access to rail or port, does it? A. Well, we are talking about M-H zoning broadly, and I answered the question in that vein.

"Q. (By Mr. MacDaniel) Why do you require a junk yard to be in an M-H zone there? You are in favor of a junk yard in an M-H zone, aren't you? A. With the right circumstances, yes.

"Q. But if a junk yard exists in an M-H zone, do you feel that all the other requirements in an M-H zone must be there in order for there to be a junk yard existing in that area? A. Generally, yes.

"Q. Why,—if they are not needed for the junk yard? A. You can go around and around and around."

Moreover, on the quarry aspect Gavrelis testified a quarry can exist with a special exception in R-10, R-20, and R-40 residential zones and in business and manufacturing zones where no blasting was required.

The only expert testimony before the Board of Appeals was that of Mr. Gavrelis who testified:

"The Board has neither reviewed or acted on this petition. With respect to the planning staff itself, we feel that the original recommendation for R-40 zoning was, in fact, correct, that again there is nothing inherent in the location, the topography, the environment of this particular property, which indicates to us that industrial zoning would be at all appropriate, pointing out that M-H zoning is the most permissive, the most liberal zone which we have on our books,

allows the broadest gamut of potential uses, and from a planning staff viewpoint we do not at all feel that is an appropriate place for the establishment of these broad zoning potentials, to start with, having from a staff position rejected the concept of industrial zoning here, to start with, the business of dealing with junk yard becomes somewhat moot.

"From a staff position, however, we do not at all feel that junk yards are a felicitous or happy or compatible land use generally. They offer, very obviously, some very unique problems, and offer some very difficult relationships to adjoining properties, recognizing that junk yards in themselves are a problem, we do believe there are locations in Baltimore County which have the appropriate zoning, which could be utilized, and properly so, for this kind of use.
\* \* \*
"We do not recommend the establishment of a junk yard here."

The burden of proof in a zoning case is on the individual seeking zoning reclassification. In *Pahl v. County Board of Appeals,* 237 Md. 294, 206 A. 2d 245 (1965) we said:

"Under the well established rule in Maryland, '\* \* \* there is a strong presumption of the correctness of original zoning and of comprehensive rezoning, and \* \* \* to sustain a piecemeal change therefrom, there must be strong evidence of mistake in the original zoning or in the comprehensive rezoning or else of a substantial change in conditions.' *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 269-70, 192 A. 2d 502. See also *Greenblatt v. Toney Schloss,* 235 Md. 9, 200 A. 2d 70." *Id.* at 297.

In *Reese v. Mandel,* 224 Md. 121, 167 A. 2d 111 (1961) we said:

"In testing the action of the Board of Appeals herein, we start off with a strong presumption of the validity of the classifications made when the compre-

hensive map was adopted, and those who attack the classifications bear a heavy burden of overcoming the presumption of their validity—heavier in the case of comprehensive zoning than in the case of piecemeal reclassification." *Id.* at 128.

We further said there:

"Where the validity of the action taken by the Board is reasonably and fairly debatable, as we have stated was the case here, the courts have no authority to overturn that action by substituting their judgment for that of the Board." *Id.* at 129.

Stated in another way:

" '[T]he Courts may not substitute their judgment for that of the Board when the Board's decision is supported by substantial evidence and the issue before the Board was fairly debatable.' *Bosley v. Hospital for Consumptives,* 246 Md. 197, 204, 227 A. 2d 746 (1967) citing *Vogel v. McCosh,* 242 Md. 371, 219 A. 2d 89 (1966). See also *Agneslane, Inc. v. Lucas,* 247 Md. 612, 233 A. 2d 757 (1967)." *France v. Shapiro,* 248 Md. 335, 342, 236 A. 2d 726 (1968).

See also, *Goucher College v. DeWolfe,* 251 Md. 638, 248 A. 2d 379 citing *Agneslane, supra.*

Judge Singley, in stating the law applicable to reclassification continued:

"However, the '[C]ourt will, where the record is so devoid of substantial supporting facts as to be incapable of raising a debatable issue, declare the legislative or administrative action invalid.' *Baker v. Montgomery County Council,* 241 Md. 178, 186, 215 A. 2d 831 (1966) citing *Jobar Corp. v. Rodgers Forge,* 236 Md. 106, 202 A. 2d 612 (1965); *Levitt and Sons v. Board of County Commissioners,* 233 Md. 186, 195 A. 2d 723 (1963)." *France, supra,* at 342.

In *Hewitt v. Co. Comm'rs,* 220 Md. 48, 58, 151 A. 2d 144 (1959) Chief Judge Brune quoted, with approval, *Huff v.*

*Board of Zoning Appeals,* 214 Md. 48, 57, 133 A. 2d 83 (1957) wherein our present Chief Judge stated:

" 'Where a zoning ordinance or an amendment puts a small area in a zone different from that of the surrounding area, we have what may be called "spot zoning", using the term in a descriptive sense. Such zoning may be invalid or valid. *If it is an arbitrary and unreasonable devotion of the small area to a use inconsistent with the uses to which the rest of the district is restricted and made for the sole benefit of the private interests of the owner, it is invalid. Cassel v. City of Baltimore,* 195 Md. 348, 355. On the other hand, if the zoning of the small parcel is in accord and in harmony with the comprehensive zoning plan and is done for the public good—that is, to serve one or more of the purposes of the enabling statute, and so bears a substantial relationship to the public health, safety, morals and general welfare, it is valid. *Offutt v. Board of Zoning Appeals,* 204 Md. 551, 561; *Temmink v. Board of Zoning Appeals,* 205 Md. 489, 495; *Ellicott v. City of Baltimore,* 180 Md. 176, 183; *Cassel v. City of Baltimore, supra.'* " (emphasis added)

There are certain exceptions to "spot zoning" recognized in the *Cassel* and *Temmink* cases, "such as the creation of small districts within a residential zone for the operation of such establishments as grocery stores, drug stores, barber shops, and even gasoline stations, for the accommodation and convenience of the residents of the residential zone. Cf. *Ellicott v. City of Baltimore,* 180 Md. 176, 23 A. 2d 649." *Hewitt, supra,* at 60.

The opinion in the Circuit Court for Baltimore County states in part:

"* * * We feel that the harm to the applicants outweighs a very nebulous benefit to the public by disallowing this business of substantial investment and longevity."

This position is in direct conflict with Chief Judge Hammond's comment in *Huff* which appeared in *Hewitt, supra.*

If we were to assume, *arguendo,* that the Baltimore County Planning Department was unaware of the use made of the subject property, it would nevertheless be noteworthy that there was no expert testimony before the Board of Appeals as to the reasonable probability of a different zoning classification had the zoning authorities been aware of such use. It also is noteworthy that the only expert who testified before the Board stated with reference to an MH zone that he regarded an inherent requirement to be access to rail or port facilities. There was no showing of such access.

The presence of a nonconforming use in an area would not and could not be evidence of error in original zoning requiring a change of classification. To so hold would defeat the very purposes of zoning. Ordinarily, planners expect that nonconforming uses will wither on the vine, so to speak, and ultimately disappear. The usual zoning ordinance provides, as does the Baltimore County ordinance, that a discontinuance of a nonconforming use for a specified period of time shall be deemed an abandonment.

No evidence was presented that the use contemplated for the subject property was the only use for which it was fitted. In fact, the modern home of Shifflett was located thereon. Although there was an allegation that the topography of the land was "rough and rugged", there was no showing that the 30.5 acres of land of Shifflett differed in its terrain from the many acres of residential land surrounding it.

The burden of proof was on Shifflett. The Board of Appeals conceded that there was no evidence of any substantial change in the character of the neighborhood. The uncontradicted evidence is that the entire surrounding area is devoted to residential uses. We hold the record to be devoid of substantial supporting facts as to original error. The request here is squarely within the language of *Huff* and *Hewitt, supra.* The request was for the sole benefit of the private interests of the owner and is for a use inconsistent with the uses to which the rest of the district is restricted.

*Order reversed, costs to be paid by the appellees.*

BARNES, J., concurring:

I most reluctantly concur in the result in this case. I only concur because I *must* as a result of the doctrine of *stare decisis*.

The result in the case on this appeal—contrary to the result reached both by the Board and by the Circuit Court—is based upon two lines of decision in this Court both of which I consider to be quite erroneous and contrary to a correct understanding of the constitutional provisions involved.

The first of these erroneous lines of decision is the Maryland "change in conditions—mistake in original zoning" rule. My comments upon this unfortunate rule in regard to its curious inception, its illogical character and its unhappy results, have already appeared at some length in earlier dissenting and concurring opinions. See *MacDonald v. Board of County Comm'rs,* 238 Md. 549, 557, 604, 210 A. 2d 325, 329, 340 (1965). See also *Wahler v. Montgomery County Council,* 249 Md. 62, 71, 238 A. 2d 266, 271 (1968) and *Randolph Hills, Inc. v. Whitley,* 249 Md. 78, 90, 238 A. 2d 257, 264 (1968).

These comments need not be repeated again or even summarized here. The present case, however, appears to me to be a good example of an unfortunate and unsound result, emanating from this erroneous doctrine, which is gravely injurious to the property rights of Shifflett, the property owner, and to the public interest as well.

First of all, it is established that the junk use is a lawful use of private property, and does not create a nuisance *per se. Town of Bladensburg v. Berg,* 216 Md. 292, 296, 139 A. 2d 703, 705-06 (1958).

Secondly, the private property involved in this case has been used for the lawful purpose since 1932, assuming, arguendo, that Section 200.16 of the Baltimore County Zoning Regulations is unconstitutional. The property owner has a substantial investment of approximately $300,000 in this property and the business conducted there. The use of this property for a lawful business is, in my opinion, a *vested* property right. The lawful use provides substantial employment for 10 full-time employees, and two part-time employees, with a payroll of ap-

proximately $60,000 per year. The use not only is beneficial to the economy generally but specifically provides employment and advances the public interest in that important way.

Thirdly, the vesting of this property right occurred some 13 years before the original zoning in the area in 1945 and has continued without interruption until the present time.

What other property owner has been injured by this use? Some of the protestants in this case did not even know of the existence of the use when they acquired and moved into their properties. While others knew about the use, some could not see the subject property from their own properties; and not one testified in regard to any specific injury to him personally or even to any specific amount of depreciation in the value of his property resulting from Shifflett's use. The terrain where the junk use is carried on is quite rough and at one time there was a quarry on the property. No nearby or other property owner has sought any relief in equity for any alleged nuisance, doubtless because there is no nuisance. And yet, notwithstanding this factual situation, his long-established lawful and beneficial use, by the terms of Section 200.16 of the Baltimore County Zoning Regulations, enacted by the County Council on November 17, 1962, must be obliterated, with no provision for just compensation, unless the Board could pursuant to its delegated legislative powers rezone a sufficient part of the subject property to enable the property owner to continue the use. At this point the difference between what I conceive to be the proper constitutional doctrine which ought to be applied and the Maryland "change-mistake" rule becomes clearly apparent.

It is conceded that there has been no "change in conditions" since the last comprehensive rezoning to justify the Board in approving the rezoning. I must agree with the majority in its observation that the *proof* in the present case does not support the Board's finding that there was a "mistake in original zoning." There was no expert testimony to this effect introduced on behalf of Shifflett. Indeed, the *only* expert testimony in the case—that of Mr. Gavrelis—indicated (hypothetically, at least) that there was, in his opinion, no error in the original zoning. It is apparent, I think, that merely because there was a non-conforming use created at the time of the original zoning,

which was not then made to conform by some type of zoning, there is not, *ipso facto,* a "mistake" in the original zoning.

If, however, the proper constitutional doctrine were applied, which, in my opinion, is whether or not the rezoning action of the Board was "arbitrary, unreasonable or capricious" and thus a denial of due process of law contrary to Article 23 of the Declaration of Rights in the Maryland Constitution—the usual test in other challenges to the exercise of legislative power (unless limited by the provisions of the delegation of the exercise of this power to an agency other than the legislative body itself),—it is clear to me that the Board's action in this case was not at all "arbitrary, unreasonable or capricious" but, on the contrary, was a reasonable decision, based on the preservation of vested property rights and calculated to advance the public interest. In short, as I have indicated in the other opinions mentioned, the Maryland "change-mistake" rule confines the exercise of the legislative power in rezoning cases to a consideration of two factors only, and thus creates a new *constitutional limitation.* As I see it, there are a number of other equally important factors which the legislative body exercising the rezoning power could well take into consideration in reaching a reasonable decision, even though there may not be in the particular case a "change in conditions" or "mistake in original zoning." Indeed, the tempering of the effect of a harsh and inequitable application of a general provision of the zoning law to a particular factual situation is one of the essential functions of the Board in exercising its rezoning functions, so long as the exercise of that necessary power does not result in arbitrary, unreasonable, discriminatory or capricious action. In my opinion, reasonable men could conclude that both justice to the property owner and the public interest required the granting of the rezoning in this case and it cannot properly be said that the Board's action offended the constitutional limitation of due process of law by being arbitrary, unreasonable or capricious or discriminatory. When this situation exists, we have no constitutional power to disturb the legislative action, unless there is some violation of another constitutional protection enjoyed by the property owner, e.g., when there is an attempt to take private property for public use without the payment of just com-

pensation contrary to Article III, Section 40 of the Maryland Constitution.

This brings me to the second line of erroneous decision, which began with *Grant v. Mayor and City Council of Baltimore,* 212 Md. 301, 129 A. 2d 363 (1957) and has unfortunately been continued with increasing vigor in *Eutaw Enterprises, Inc. v. Mayor and City Council of Baltimore,* 241 Md. 686, 217 A. 2d 348 (1966) and *Shifflett v. Baltimore County,* 247 Md. 151, 230 A. 2d 310 (1967).[1]

In my concurring opinion in *Stevens v. City of Salisbury,* 240 Md. 556, 573, 214 A. 2d 775, 785 (1965), I indicated my distress at the Court's approval of its prior decision in *Grant* and expressed the hope that the *Grant* decision would be overruled by the Court as soon as possible or, at least, strictly limited to the facts in the *Grant* case. As indicated, neither hope was realized.

In my concurring opinion in *Stevens,* I quoted at some length from the "dissenting" opinion[2] of Judge Van Voorhis of the Court of Appeals of New York in *Harbison v. City of Buffalo,* 4 N.Y.2d 553, 564, 176 N.Y.S.2d 598, 606, 152 N.E.2d 42, 52 (1958), in which my views on this extraordinary doctrine of the constitutionality of the elimination by legislative provision of established non-conforming uses by the use of an "amortization" period in the statute, but without provision for the payment of just compensation, are fully articulated by Judge Van Voorhis. Again, I need not repeat these views here. When the right to use private property for a lawful use *vests*—as the right has, in my opinion, in this case,—the *only* constitutional way that vested right may be eliminated by the State or its political subdivisions against the will of the property owner is by the exercise of the power of eminent domain and the payment of just compensation. As Mr. Justice Holmes aptly stated in 1922

---

1. By coincidence, by the operation of our general practice of sitting in panels of five judges, I did not sit in either *Eutaw Enterprises, Inc. v. Mayor and City Council of Baltimore* or in *Shifflett v. Baltimore County.* I would have dissented in both cases had I sat.

2. As pointed out in Note 1 in the concurring opinion in the Stevens case, the Van Voorhis opinion is not really a "dissenting" opinion as there was no majority opinion in the Harbison case.

in *Pennsylvania Coal Co. v. Mahon,* 260 U. S. 393, 415, 43 S. Ct. 158, 160, 67 L. Ed. 322, 326:

"The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. * * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States."

Quite apart from our obligation as I see it to protect Shifflett's property rights under the provisions of the Maryland Constitution, to fail to require payment to Shifflett for the deprivation of his right to continue to use part of the subject property for his lawful use is, in my opinion, contrary to the public interest.

Where will Shifflett get the necessary money to continue his business? Where will he locate his business, if he is fortunate enough to have sufficient private resources to re-establish his business at another location, in view of the very few locations in Baltimore County as a result of the present legislative and other restrictions? If he is forced out of business, who will perform the useful function accomplished by his business and where will his employees be employed and receive the wages necessary to support them and their families? If we had held that Section 200.16 of the Baltimore County Zoning Regulations, enacted November 17, 1962, was unconstitutional and void, as I firmly believe it to be, Shifflett would not have to seek answers to these questions and, in my opinion, the public interest would also be served.

Finally, it is not without irony that in the first of these erroneous lines of decision, we have, in my opinion, *placed a restriction* on the exercise of the legislative power *more stringent than permitted to us under the Maryland Constitution,* whereas in the second of these erroneous lines of decision, *we have*

*declined to place a restriction* upon the exercise of the legislation which seems to me *to be clearly required* by the constitutional prohibitions against taking private property for public use without the payment of just compensation. In the sonorous words of Archbishop Cranmer in the General Confession in Morning and Evening Prayer in the Book of Common Prayer "* * * we have left undone those things which we ought to have done and have done those things which we ought not to have done * * *." I will not, however, add the next clause. I still hope that ultimately we will return to more orthodox constitutional doctrine in the two areas mentioned.